# ALLISON CARUSILLO ET AL. *v.* ASSOCIATED WOMEN'S HEALTH SPECIALISTS, P.C.
## (AC 21604)

Dranginis, Flynn and Daly, Js.[1]

Argued June 10—officially released September 3, 2002

[1] This appeal was argued before a panel comprised of Judges Dranginis, Flynn and Daly. Although Judge Daly agreed with the other judges regarding the resolution of this appeal, he died before he had the opportunity to concur with the written decision. The parties stipulated, however, that they would not reargue the appeal to this court with a panel consisting of the original two judges and an additional judge. Rather, the parties stipulated that they would permit the remaining two judges alone to render a written decision.

*William F. Gallagher*, with whom, on the brief, were *Roger B. Calistro* and *David McCarry*, for the appellants (plaintiffs).

*Eugene A. Cooney*, for the appellee (defendant).

*Opinion*

DRANGINIS, J. In this medical malpractice action, the plaintiff Allison Carusillo[2] appeals from the judgment of the trial court rendered in favor of the defendant, Associated Women's Health Specialists, P.C., following the granting of the defendant's motion to set aside the verdict in the plaintiff's favor. The court granted the motion on the ground that the jury had returned a verdict in favor of the plaintiff on the basis of inadmissible hearsay. On appeal, the plaintiff raises several arguments in support of her central claim that the evidence presented at trial did not constitute hearsay and, thus, that the court improperly granted the defendant's motion. The plaintiff, therefore, urges this court to reinstate the jury's verdict and damages award. We agree with the plaintiff and reverse the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of the plaintiff's appeal. At around 4:30 a.m., on October 6, 1994, the plaintiff went into labor prior to the birth of her first child and was admitted to Waterbury Hospital for the baby's delivery. The plaintiff's obstetrician-gynecologist, Janet Vodra, a physician employed by the defendant medical practice, examined the plaintiff at approximately 9 a.m. and observed that the plaintiff was 2.5 centimeters dilated

---

[2] Although Stephen Carusillo, the husband of Allison Carusillo, also is a plaintiff, we refer in this opinion to Allison Carusillo as the plaintiff.

and in the first stage of labor. Vodra returned at around 5:30 p.m. to deliver the plaintiff's baby. After reexamining the plaintiff, she found that the baby was located at a "plus two" station and that the baby was facing up in the womb, rather than the preferred position of downward. A "plus station" refers to the position of the baby's skull to the level of the ischial spines in the mother's birth canal. In this case, a plus two station meant that the baby's head was two centimeters lower than the level of the plaintiff's ischial spines in her birth canal.

As the progress of the baby's birth was atypically slow, Vodra decided to apply a vacuum extractor to assist in the baby's delivery. That procedure is also known as an instrumental delivery. When several attempts with the vacuum failed, Vodra performed an episiotomy on the plaintiff and then resumed utilizing the vacuum. The baby still failed to emerge, and Vodra realized that an obstetrical emergency called "shoulder dystocia" was occurring.[3] In response to the emergency, Vodra performed a larger, fourth degree episiotomy on the plaintiff.[4] The baby was soon thereafter delivered. Once the baby was delivered, Vodra surgically repaired the fourth degree episiotomy.

After the birth of her baby, the plaintiff began to suffer from severe discomfort and pain. She noticed that fecal matter would seep out of her vagina during bowel movements. A few weeks after the baby's birth, Vodra examined the plaintiff and discovered that her episiotomy wound had not healed and that she had developed a fistula, a small hole between her rectum and vagina. The problem persisted for a couple of

---

[3] Shoulder dystocia is a medical emergency in which the position of the baby's shoulders in the birth canal complicates, and may even prevent, a vaginal delivery.

[4] In that episiotomy, Vodra made an incision that extended from the base of the vagina through the rectal sphincter and into the rectum.

months. On January 30, 1995, Ian Cohen, another physician in the defendant medical practice, performed a surgical repair on the plaintiff. Despite the surgery, the plaintiff continued to experience pain and began to suffer from incontinence. The plaintiff then was diagnosed with having an anal fissure for which she underwent a second surgery on July 12, 1995, that was performed by David Cherry, a physician who was not associated with the defendant. The second surgery repaired the fissure, but the plaintiff continues to suffer from permanent hygiene problems.

On April 26, 1996, the plaintiff filed an action against the defendant, naming Vodra and Cohen as its agents and alleging, in pertinent part, that Vodra, under the circumstances, negligently had performed a high pelvic instrumental delivery, namely, the use of the vacuum, which caused the occurrence of shoulder dystocia, thereby resulting in the fourth degree episiotomy and all of her ensuing health problems.[5] A jury trial ensued.

During the trial, the plaintiff called Harold Schulman, a physician, to testify as her expert witness in the field of obstetrics and gynecology. The plaintiff questioned Schulman regarding the correlation between high pelvic instrumental deliveries and the occurrence of shoulder dystocia. In response, Schulman stated in pertinent part: "We make—we make these opinions in obstetrics because we find statistical associations. In other words, if there's an adverse outcome, then one likes to look back at the events that preceded it and see if there [are] any factors which play a role in the decision-making and the outcome. For a shoulder dystocia, there's a clear

---

[5] The plaintiff also alleged that Vodra negligently had failed to summon a more experienced physician to assist with or to take over the delivery of the baby, failed to properly close and repair the fourth degree episiotomy, failed to procure a more experienced physician to repair the fourth degree episiotomy, and that Vodra and Cohen had failed to properly repair the fistula during the surgery performed on January 30, 1995.

association with instrument deliveries. That association exists for all the reasons we pointed—for the mechanism of labor problems we pointed out today. We know there's an association with the use of oxytocin . . . ."

The defendant's counsel objected to Schulman's testimony on the ground that "when I hear the word 'we,' I hear that this is a witness talking about a hearsay subject. . . . Now, we have some articles that are in evidence in this case. If he wants to use those, I have no problem. If he wants to bring in other articles and establish that they're authoritative, I have no problem with that. That's what our rules say to do. But when he sits here and says, we know this and we know that, what he's saying is that some doctor who said something in Chicago five years ago said something, that's hearsay." In response, the plaintiff argued: "But that's not what he's saying when he says we. He's saying we, meaning the medical community, the we, the doctors who deliver babies and are board certified obstetricians-gynecologists. He's not referring to any hearsay thing. I'm asking him for the basis, and he's indicating that there's a statistical correlation. We have in evidence the studies that show that there's a statistical correlation, and those have been marked as exhibits." The defendant's counsel then stated: "I have no objection if he wants to refer to those. If he wants to start talking about we know this and we know that, this is hearsay." The plaintiff replied, "I disagree, Your Honor. He's basing it on his experience, his practice and on his knowledge of the standards in obstetrical-gynecological practice."

The court then asked Schulman to whom he was referring by saying "we." Schulman answered, "Well, I'll just abandon the use of the word 'we' just to avoid the dilemma. But I must confess, my experience in court is that scientific evidence is not frequently debated." After the defendant reiterated the objection on the

ground of hearsay, the plaintiff referred the court to an excerpt from J. Williams, Obstetrics (19th Ed. 1993), an authoritative textbook that previously had been entered into evidence, to support Schulman's testimony. The court responded: "And I'm allowing—I'm going to allow—I've heard enough. I'm going to allow the doctor to testify. Let's continue on."

Schulman proceeded to testify that a statistical association exists between the use of a vacuum and shoulder dystocia, and high pelvic deliveries and shoulder dystocia. The defendant then asked the court to strike the testimony because "[w]e do not know where these studies are coming from. We have no idea what he's referring to, and we don't know whether it's reliable or not." The court asked Schulman for the basis of his opinion, to which Schulman replied: "Published peer review articles." The defendant argued: "[T]hat's precisely the problem. We do not have them." The plaintiff stated: "Your Honor, if [the defendant's counsel] has published peer review articles that state to the contrary, he's certainly entitled to cross-examine this witness with those. I mean, I think in view of the fact, as counsel is aware, that we've marked into evidence [J. Williams, Obstetrics, supra], and those studies that are cited by [J. Williams, Obstetrics, supra], this whole line of objection is spurious. I think that Doctor—even if there weren't any published studies, I think he is, based on his clinical experience and his years of practice and his knowledge of the standard, is entitled to say what his— what his experience has been in terms of a statistical correlation between deliveries . . . ." The court ruled: "Sure. That wasn't asked in that many words, but I certainly will allow that. With that understanding, I allowed the evidence. Let's proceed."

On August 4, 2000, the jury returned a general verdict in favor of the plaintiff and awarded damages in the amount of $270,000, $5000 of which constituted eco-

nomic damages, and the remaining $265,000 in noneco-nomic damages. Five days later, the defendant filed a motion to set aside the verdict on the ground that the evidence presented at trial was insufficient to establish that Vodra had breached the appropriate standard of care and that if any breach had occurred, the evidence was inadequate to prove that such breach caused the plaintiff's injuries. Moreover, the defendant argued in its motion to set aside the verdict, in pertinent part, that the court improperly had admitted the hearsay testimony of Schulman.[6]

The court granted the defendant's motion to set aside the verdict on January 17, 2001, and, accordingly, rendered judgment in favor of the defendant. In its memorandum of decision, the court stated: "In order to establish the essential element of causation, Dr. Schulman was asked, during direct examination, questions as to whether or not there was a causal relationship between high pelvic instrumental delivery and shoulder [dystocia], a hotly contested issue in this case. In several of his responses to questions regarding the relationship, he used the pronoun 'we.' . . . Dr. Schulman indicated that he was referring to peer review medical literature. The defendant's counsel objected and moved to strike the answer, its objection was overruled and its motion denied. However, upon review, the court believes that the defendant's objection should have been sustained and its motion to strike granted because Dr. Schulman's statement indicated his reliance upon unidentified medical literature to base his opinion as to causation was a reference to unreliable hearsay. Further, and adding to the gravity of this problem is the fact that this was the only evidence supporting the plaintiff's theory of causation, a crucial element in her case. . . .

---

[6] In raising that argument, the defendant referred to the passages in the transcript that we have set forth.

"Immediately following Dr. Schulman's disclosure, the plaintiff, in argument seeking to have the court overrule the defendant's objection, attempted to relate Dr. Schulman's statement to certain medical literature that was in evidence; however, a review of his testimony clearly indicates to the contrary. While absent this error, the evidence viewed in the light most favorable to the plaintiff may have supported the jury's general verdict for her, the admission of unreliable hearsay as [previously] discussed, compels the court to grant the defendant's motion to set aside and to render judgment for the defendant." This appeal followed.

The plaintiff raises several evidentiary claims in support of her argument that the court improperly granted the defendant's motion to set aside the verdict.[7] Specifically, the plaintiff contends that Schulman's testimony did not constitute inadmissible hearsay because (1) it was based on an authoritative medical text that had been admitted into evidence and (2) it was properly admitted pursuant to § 7-2 of the Connecticut Code of

---

[7] The defendant argues that we should decline to address the plaintiff's claims because the record is inadequate for our review. See Practice Book § 61-10. Specifically, the defendant contends that an articulation was needed because the memorandum of decision fails sufficiently to provide the basis of the court's determination. We disagree and find that the record is adequate for our review and that the court, in its memorandum of decision, more than sufficiently revealed the basis of its conclusion.

The defendant further claims that the plaintiff's claim is improperly raised because "[a]t the trial level, she articulated no valid hearsay exception or nonhearsay basis for admission of Dr. Schulman's statements." We again disagree and conclude that the plaintiff's claims are properly before us on appeal. During the trial, the plaintiff invoked the same arguments in support of admitting Schulman's testimony as she now raises before this court, namely, that Schulman's testimony was based on J. Williams, Obstetrics, supra, and that Schulman's experience and knowledge entitled him to render his opinion on the correlation between high pelvic instrumental deliveries and shoulder dystocia. We further note that given that the court overruled the defendant's objections at trial, the plaintiff was not alerted to the necessity of preserving any claims. Accordingly, the defendant's challenges to this appeal on procedural grounds lack merit.

Evidence. We agree and reverse the judgment of the trial court.

Before analyzing the issues before us, we first set forth the appropriate standard of review. "A court is empowered to set aside a jury verdict when, in the court's opinion, the verdict is contrary to the law or unsupported by the evidence. . . . A verdict should not be set aside, however, where it is apparent that there was some evidence on which the jury might reasonably have reached its conclusion. . . . Before determining whether the granting of a motion to set aside is proper, the trial court must look at the relevant law that it gave the jury to apply to the facts, and at the facts that the jury could have found based on the evidence. The law and evidence necessarily define the scope of the trial court's legal discretion. . . . This discretion vested in the trial court is not an arbitrary or capricious discretion, but, rather, it is legal discretion to be exercised within the boundaries of settled law. . . . This limitation on a trial court's discretion results from the constitutional right of litigants to have issues of fact determined by a jury. . . . The trial court, upon a motion to set aside the verdict, is called on to question whether there is a legal reason for the verdict and, if there is not, the court must set aside the verdict. . . .

"In reviewing a trial court's decision to set aside a jury verdict, we must consider the evidence in the light most favorable to the party who succeeded before the jury. . . . While an appellate court must give great weight to a trial court's decision to set aside a verdict, an appellate court must carefully review the jury's determinations and evidence, given the constitutional right of litigants to have the issues decided by a jury. Great weight should be given to the action of the trial court and the presumption is that a verdict is set aside only for good and sufficient reason. However, the record must support that presumption and indicate that the

verdict demonstrates more than poor judgment on the part of the jury. . . . While we do not attempt to substitute our judgment for that of the trial judge, we must determine whether the jury award was such that the trial judge could have properly substituted his judgment for that of the jury. . . . An appellate court, therefore, in reviewing whether a trial court abused its legal discretion, must review the entire record and [all] the evidence." (Citation omitted; internal quotation marks omitted.) *Downes-Patterson Corp.* v. *First National Supermarkets, Inc.*, 64 Conn. App. 417, 424–25, 780 A.2d 967, cert. granted on other grounds, 258 Conn. 917, 782 A.2d 1242 (2001) (appeal dismissed June 25, 2002).

In the present situation, the *causal* relationship between a high pelvic instrumental, or vacuum assisted, delivery and shoulder dystocia constituted the critical issue on which the case turned. Without proving causation, namely, that the high pelvic instrumental delivery caused the shoulder dystocia, the plaintiff could not prevail on her medical malpractice claim. As previously set forth, the court granted the defendant's motion to set aside the verdict on the ground that Schulman's "statement indicating his reliance upon unidentified medical literature to base his opinion as to causation was a reference to unreliable hearsay. Further, and adding to the gravity of this problem, is the fact that this was the only evidence supporting the plaintiff's theory of causation, a crucial element in her case." We conclude that the court improperly found that Schulman's testimony constituted inadmissible hearsay and, consequently, that the court improperly set aside the jury's verdict.

"In order for a plaintiff to prevail in an action seeking damages arising out of a claim of medical malpractice, the plaintiff must produce evidence supporting (1) the requisite standard of care, (2) evidence supporting a deviation from that standard, and (3) *evidence of a*

*causal relationship* between the deviation and the claimed injury." (Emphasis added.) *Rodriguez* v. *Petrilli*, 34 Conn. App. 871, 877, 644 A.2d 381 (1994); see also *Marchell* v. *Whelchel*, 66 Conn. App. 574, 582, 785 A.2d 253 (2001). "All medical malpractice claims, whether involving acts or inactions of a defendant physician, require that a defendant physician's conduct proximately cause the plaintiff's injuries. The question is whether the conduct of the defendant was a substantial factor in causing the plaintiff's injury. Expert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." (Internal quotation marks omitted.) *Poulin* v. *Yasner*, 64 Conn. App. 730, 738, 781 A.2d 422, cert. denied, 258 Conn. 911, 782 A.2d 1245 (2001); see also Conn. Code Evid. § 7-2;[8] 2 B. Holden & J. Daly, Connecticut Evidence (2d Ed. 1988) §§ 119d through 119f.

"[A]n expert's opinion is not rendered inadmissible merely because the opinion is based on inadmissible hearsay, so long as the opinion is based on trustworthy information and the expert had sufficient experience to evaluate that information so as to come to a conclusion which the trial court might well hold worthy of consideration by the jury." (Internal quotation marks omitted.) *George* v. *Ericson*, 250 Conn. 312, 321, 736 A.2d 889 (1999). "An expert may base his opinion on facts or data not in evidence, provided they are of a type reasonably relied on by experts in the particular field. . . . This is so because of the sanction given by the witness's experience and expertise. . . . [W]hen the expert wit-

---

[8] Connecticut Code of Evidence § 7-2 provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

ness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise. . . . The better reasoned authorities favor the admissibility of expert opinion that is partly derived from written sources." (Citations omitted; internal quotation marks omitted.) *In re Barbara J.*, 215 Conn. 31, 43, 574 A.2d 203 (1990); see also Conn. Code Evid. § 7-4.[9]

During the trial, in response to the defendant's objections to Schulman's testimony, the plaintiff argued, in part, that Schulman's statements were based on J. Williams, Obstetrics, supra, a medical treatise that previously had been entered into evidence. A review of the relevant portions of that treatise indeed reveals information from which Schulman's conclusions could have been derived. For example, the treatise states that "[a]t least three intrapartum factors have been reported to be associated with an increased incidence of shoulder dystocia: (1) prolonged second stage of labor, (2) oxytocin induction or augmentation of labor, and (3) use of midforceps or a vacuum extraction during delivery." The treatise also states that a study conducted by "Benedetti and Gabbe (1978) reported that with a prolonged second stage of labor and a midpelvic delivery (vacuum extraction or midforceps delivery), the

---

[9] Connecticut Code of Evidence § 7-4 provides in relevant part: "(a) . . . An expert may testify in the form of an opinion and give reasons therefor, provided sufficient facts are shown as the foundation for the expert's opinion.

"(b) . . . The facts in the particular case upon which an expert bases an opinion may be those perceived by or made known to the expert at or before the proceeding. The facts need not be admissible in evidence if of a type customarily relied on by experts in the particular field in forming opinions on the subject. The facts relied on pursuant to this subsection are not substantive evidence, unless otherwise admissible as such evidence. . . ."

incidence of shoulder dystocia" increased.[10] We accordingly conclude that Schulman's testimony finds support in J. Williams, Obstetrics, supra, which properly had been admitted into evidence and was recognized by both parties as the authority in the field of obstetrics and gynecology.[11]

Although Schulman did not necessarily name the peer review articles on which he relied, nor did the court ask him to provide those titles, sufficient textual support for his statements, namely, J. Williams, Obstetrics, supra, already had been entered into evidence.[12] Accordingly, this was not a situation wherein the expert witness provided testimony or made assertions that lacked any

[10] In quoting that passage, we note that Schulman opined that midpelvic and high pelvic deliveries are synonymous terms.

[11] To the extent that the court in its memorandum of decision found that Schulman did not rely on J. Williams, Obstetrics, supra, or that his reliance on that treatise was misplaced, we disagree with both determinations. As we will discuss, it can be inferred that Schulman relied on J. Williams, Obstetrics, supra. Moreover, whether Schulman properly relied on that treatise in rendering his opinion went to the weight and not to the admissibility of the testimony. See *Hayes* v. *Decker*, 66 Conn. App. 293, 302–303, 784 A.2d 417 (2001) (" 'judge should admit [medical] testimony when there are good grounds for [the] expert's conclusion, even if the judge thinks that there are better grounds for some alternative conclusion' "), cert. granted on other grounds, 259 Conn. 928, 793 A.2d 253 (2002).

[12] Complicating the situation is the fact that during the trial, the court overruled the defendant's objections to Schulman's testimony and accepted the plaintiff's argument that Schulman's conclusion was derived from J. Williams, Obstetrics, supra. On the basis of the court's rulings, the plaintiff had no reason to further question Schulman about the names or content of other peer review articles, nor was the plaintiff alerted to the necessity of doing so. Moreover, the court's ruling demonstrates that it permitted Schulman's testimony regarding the statistical relationship between high pelvic instrumental deliveries and shoulder dystocia because of Schulman's experience and knowledge in the field of obstetrics and gynecology. Had the court sustained the defendant's objections in the first place, then the plaintiff presumably would have had the opportunity to present further support for Schulman's opinion or to introduce additional medical texts. In setting aside the verdict, however, the court essentially reversed its evidentiary ruling, thereby depriving the plaintiff of the opportunity during trial to correct any impropriety.

foundation or support. See C. McCormick, Evidence (3d Ed. 1984) § 324.2, p. 910 ("expert must, of course, be allowed to disclose to the trier of fact the basis facts for his opinion, as otherwise the opinion is left unsupported in midair with little if any means for evaluating its correctness"). Rather, the foundation for the statements existed in, and could be found in, the record. To the extent that the defendant disagreed with Schulman's opinion, the defendant had the opportunity and the means to cross-examine Schulman and to expose any weaknesses or impropriety in his direct testimony on the basis of excerpts from J. Williams, Obstetrics, supra, or any other authoritative text. Significantly, the defendant does not contend that its right to confrontation was in any way infringed.

The defendant argues that the court properly concluded that Schulman relied on unidentified medical literature that resulted in a reference to unreliable hearsay evidence. Specifically, the defendant claims that "the plaintiff at a minimum should have identified the articles in question and asked the witness whether these were the types of articles upon which obstetricians customarily rely in forming opinions." The defendant further urges that the plaintiff, without having provided such information, could not prove the "reliability and relevance of the articles upon which Dr. Schulman relied."[13] We are not persuaded.

As previously stated, Schulman's testimony regarding the statistical associations finds support in J. Williams, Obstetrics, supra, a medical text that had been entered into evidence and that the defendant recognized as authoritative. Given that the defendant also relied on that treatise throughout the trial, we cannot agree with

---

[13] We reiterate the difficulty that this situation presents. On the basis of the court's rulings during trial, it was unnecessary for the plaintiff to make any such showing, nor was the plaintiff aware of the *need* to do so.

the defendant's argument that the plaintiff failed to establish the threshold showing that Schulman derived his testimony from reliable and relevant sources.

As an expert witness, Schulman was entitled to base his opinion on J. Williams, Obstetrics, supra, and other peer review articles. See *Pickel* v. *Automated Waste Disposal, Inc.*, 65 Conn. App. 176, 192–93, 782 A.2d 231 (2001). "[W]hen the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise." (Internal quotation marks omitted.) *In re Barbara J.*, supra, 215 Conn. 43. We conclude that Schulman's testimony was not based on inadmissible hearsay and, therefore, that the court abused its discretion in setting aside the verdict on that ground.

The plaintiff further contends that Schulman's testimony properly was admitted pursuant to § 7-2 of the Connecticut Code of Evidence.[14] We agree. Expert testimony may be presented in numerous ways, including "by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based on a hypothetical question." (Internal quotation marks omitted.) *Aspiazu* v. *Orgera*, 205 Conn. 623, 631, 535 A.2d 338 (1987).

Even if we assume arguendo that Schulman improperly relied on unreliable hearsay, a thorough review of the transcripts reveals that notwithstanding his statement that he based his statistical associations on published peer review articles and notwithstanding his use

---

[14] The plaintiff also argues that Schulman's testimony was admissible because he utilized the technique of "differential diagnosis" in arriving at the conclusion that the high pelvic instrumental delivery caused the shoulder dystocia.

of the word "we," Schulman expressed his professional opinion and diagnosis that the high pelvic instrumental delivery caused the occurrence of shoulder dystocia. Prior to discussing the statistical associations, the plaintiff asked Schulman on direct examination: "Do *you* have an opinion based upon a reasonable medical probability as to whether . . . this delivery was a high pelvic instrument delivery in breach of the duty of care owed . . . ." (Emphasis added.) Schulman responded: "Yes. . . . [Based on] the events which transpired. . . . The fact that there was a shoulder dystocia, the fact that this was preceded by a prolonged second stage." Later in direct examination, Schulman testified that due to the absence of other factors that often lead to shoulder dystocia, such as diabetes and fetal macrosomia, he was constrained to conclude that the high pelvic instrumental delivery caused the shoulder dystocia.

During the trial, the defendant did not challenge Schulman's qualifications as an expert and in fact stipulated to his qualifications.[15] Given Schulman's qualifications and experience, he was entitled to express his opinions with respect to the statistical relationship

[15] The defendant now argues in its brief that Schulman "was qualified in obstetrics, but the evidence does not show that he had ever performed a mid- or high-pelvic delivery that resulted in shoulder dystocia on one of his patients, that he had ever researched or written on the subject of statistical associations between instrumental deliveries and shoulder dystocia, that he had ever acquired any data upon which he could determine statistical associations for himself, or that he had any special knowledge or experience on the subject."

We first note the defendant had ample opportunity to challenge Schulman's credentials during cross-examination. Given Schulman's career of forty years in the field of obstetrics and gynecology, his roles as chairman of the department of obstetrics and gynecology at two hospitals, the fact that he has delivered thousands of babies, is a member of the American College of Obstetricians and Gynecologists and, moreover, has written almost 200 scientific articles, more than twenty of which are dedicated to the subject of labor, Schulman was more than qualified to testify as an expert. See *Blanchard* v. *Bridgeport*, 190 Conn. 798, 808, 463 A.2d 553 (1983).

between high pelvic instrumental deliveries and shoulder dystocia. In fact, it is critical to note that the court overruled the defendant's objections during trial, in part, because as an expert in the field of obstetrics and gynecology, Schulman was "entitled to say what his— what his experience has been in terms of a statistical correlation." In rendering his opinion, Schulman was permitted to draw from his years of professional experience and observations and in fact did so. See *Hammer* v. *Mount Sinai Hospital*, 25 Conn. App. 702, 718, 596 A.2d 1318, cert. denied, 220 Conn. 933, 599 A.2d 384 (1991).

We therefore conclude that the court improperly found that Schulman's testimony with respect to causation was based on hearsay. Accordingly, the court abused its discretion in setting aside the verdict. The evidence presented at trial properly was before the jury.

The judgment is reversed and the case is remanded with direction to reinstate the jury's verdict and damages award[16] and to render judgment in favor of the plaintiff.

In this opinion the other judges concurred.

---

[16] The plaintiff sought reinstatement of the jury's verdict and damages award. We note the plaintiff's alternative argument that in the event that we decline to reinstate the jury's verdict, she nonetheless is entitled to a new trial. The plaintiff further contends that if we grant her a new trial, then she should be permitted to amend her complaint. Because we agree with the plaintiff's primary claim that the jury's verdict should be reinstated, we need not address her alternative claim of relief.

