# RAAFAT R. TADROS *v.* GIUSEPPE TRIPODI ET AL.
## (AC 24622)

# RAAFAT R. TADROS *v.* CONCETTA TRIPODI ET AL.
## (AC 24623)
## (AC 24944)

# RAAFAT R. TADROS, GIUSEPPE TRIPODI AND THOMAS ALOSCO, M.D., P.C. *v.* GIUSEPPE TRIPODI ET AL.
## (AC 24624)
## (AC 24945)

Lavery, C. J., and McLachlan and Peters, Js.

Argued October 14, 2004—officially released February 8, 2005

*Thomas J. Sansone*, with whom, on the brief, was *John F. Papandrea, Jr.*, for the appellants (defendants).

*Richard P. Weinstein*, with whom, on the brief, was *Nathan A. Schatz*, for the appellees (plaintiffs).

*Opinion*

McLACHLAN, J. These appeals arise from the acrimonious dissolution of the medical practice of the plaintiff Raafat R. Tadros and the defendant Giuseppe Tripodi,

both of whom are surgeons. Of the eight lawsuits filed between the parties and their various entities,[1] six were consolidated and tried to the court, the seventh remains open following a foreclosure sale[2] and the eighth was withdrawn. In short summary, after trial, the court concluded that the defendants, Tripodi and his wife, Concetta Tripodi, secretly had stolen $876,985.27 from the medical practice over the course of several years. The court ordered them to pay the plaintiff Raafat R. Tadros, Giuseppe Tripodi and Thomas Alosco, M.D., P.C. (professional corporation) treble damages totaling $2,630,955.81, plus interest in the amount of $537,418.50. In addition, the court concluded that Giuseppe Tripodi was liable to Tadros for unpaid rent in the amount of $211,875, plus interest. Finally, as a prejudgment remedy, the court garnished the proceeds of the foreclosure sale of a building owned by Tadros' and Guiseppe Tripodi's real estate corporation held by the clerk of the Superior Court after Giuseppe Tripodi purchased the property at a foreclosure auction. The defendants claim that the court improperly (1) admitted hearsay evidence for a limited nonhearsay purpose and then improperly considered the evidence for its truth as proof of the amount stolen, (2) concluded that Giuseppe Tripodi was liable for unpaid rent, (3) awarded the plaintiffs prejudgment interest pursuant to General Statutes § 37-3a and (4) concluded that it had the authority to garnish funds held by the clerk of the Superior Court. We affirm the judgments of the trial court.

[1] For clarity and for consistency with the trial court's memorandum of decision, we shall classify Tadros, Thomas Alosco, the professional corporation and the real estate corporation as the plaintiffs and Guiseppe Tripodi, his wife, Concetta Tripodi, and Guiseppe Tripodi's entity, Middlebury Surgical, LLC, as the defendants. In reality, each was a plaintiff in some of the actions and a defendant in others.

[2] See *Tadros* v. *Middlebury Medical Center, Inc.*, 263 Conn. 235, 820 A.2d 230 (2003) (approving foreclosure sale of real estate corporation's building to Tripodi).

The following background facts essentially are undisputed. Tadros hired Giuseppe Tripodi in 1985, and the two later formed a professional corporation, Raafat R. Tadros and Giuseppe Tripodi, M.D., P.C. In 1990, Tadros and Giuseppe Tripodi purchased real estate and conveyed it to their newly formed real estate corporation, Middlebury Medical Center, Inc. (real estate corporation). The practice occupied the second floor of the building while the first floor was leased to other medical professionals. In 1996, Thomas Alosco, also a surgeon, joined the professional corporation and later became an equal shareholder with Tadros and Giuseppe Tripodi.[3] Alosco did not at any relevant time own an interest in the real estate corporation.

By the end of 2000, both the personal and professional relationship between Tadros and Giuseppe Tripodi soured, and they terminated their practice effective January 1, 2001. Giuseppe Tripodi formed a new entity, the defendant Middlebury Surgical, LLC, and Tadros and Alosco formed a new professional corporation, Raafat R. Tadros and Thomas Alosco, M.D., P.C. The two new entities continued to share the same office space until March 24, 2001, when Tadros and Alosco moved their practice to a different location. By agreement of the parties, Giuseppe Tripodi remained in the practice's original offices in the building owned by the real estate corporation.

The court in its memorandum of decision made the following findings of fact specifically related to the Tripodis' theft of funds from the plaintiff professional corporation. "Between 1991 and 2001, $876,985.27 of the corporation's revenues were 'discounted' in the corporation's records. The effect of the discount was to offset the accounts receivable of the corporation so that the

---

[3] In 1998, Alosco's name was added to the professional corporation, which became Raafat R. Tadros, Giuseppe Tripodi and Thomas Alosco, M.D., P.C.

corporate records would not show the revenue that it had earned. Although the evidence was circumstantial, the evidence points unequivocally to the conclusion that the Tripodi[s] misappropriated and committed the theft of this money. . . . [T]he items entered in the corporation's computer records under 'discount' were accompanied by computer codes used exclusively by Concetta Tripodi.[4] These codes were not used by Joyce Benoit, an administrative assistant in the office who was supervised by Concetta Tripodi in handling the office's financial records and who was the only other person in the office with substantial computer expertise.

"Second, between February 13 and 20, 2001, while the professional corporation was in the throes of an acrimonious breakup, corporation counsel Mark Neikrie and his agents seized the corporation's computer. They returned the computer to the office on February 21 and then seized it again on March 9, [2001]. During the period between February [21] and March [9], 2001, when the computer was back in the office, Concetta Tripodi made over 200 deletions of prior computer entries, some of which involved patient balances. Almost half of the matters deleted had been originally entered prior to 2000, and some had been entered as far back as 1993.[5] Although the exact economic effect of all of the deletions is not clear, they nonetheless reveal unauthorized tampering with the computer records at a particularly suspect time.

"Third, numerous canceled patient or insurance payment checks bore an endorsement of Guiseppe Tripodi

---

[4] Concetta Tripodi handled billing and other administrative matters for the professional corporation.

[5] Concetta Tripodi was not aware that before returning the computer to the office for the first time, Neikrie had made a duplicate of the computer's hard drive, which later proved the existence of changes made by Concetta Tripodi during the period between the two seizures of the computer.

alone or, less frequently, some other endorsement different from that usually used by the professional corporation. These checks were deposited into bank accounts other than the one used by the corporation for deposits. The amount in these checks was then entered under 'discount' in the corporation's records. This money was, thus, plainly diverted from the corporation by the Tripodis.

"Fourth, Guiseppe Tripodi requested and received cash for certain varicose vein procedures performed on Saturdays. Occasionally, the cash would be missing on Monday morning and, thus, would not be available for the daily deposit into the corporate bank account. Guiseppe Tripodi told Benoit that he took cash from patients and used the cash for the medication for the varicose vein procedure. Concetta Tripodi told Benoit that the former would take care of the related computer entries.

"Fifth, Guiseppe Tripodi sought to end his medical practice with Tadros because Guiseppe Tripodi felt that he was not receiving adequate compensation for the work that he was doing. Tadros preferred to adhere to the original agreement whereby each partner would receive equal shares of the earnings. Guiseppe Tripodi's dissatisfaction with the compensation scheme forms a strong motive for the theft.

"Sixth, at his deposition, Guiseppe Tripodi invoked the fifth amendment privilege against self-incrimination in response to questions concerning whether he was stealing from the business, depositing corporate revenues into noncorporate bank accounts and failing to pay income taxes on these moneys. At her deposition, Concetta Tripodi invoked the fifth amendment in response to questions concerning the deposit of corporate revenues to noncorporate accounts, her use of the office computer to discount these deposits and her use

of the computer in late February or early March, 2001, to make changes to conceal the misappropriation of funds. The court can and does draw an adverse inference from the breathtaking scope of the Tripodis' invocation of the fifth amendment."

Further facts will be provided as necessary to address the defendants' specific claims.

I

The defendants first claim that the court improperly admitted into evidence two exhibits that constituted inadmissible hearsay, and then, despite having admitted the exhibits for limited nonhearsay purposes, relied on the exhibits for their truth as proof of damages. The defendants argue that without those improperly admitted exhibits, there was an inadequate evidentiary basis to calculate damages related to the theft. We disagree.

"[T]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Additionally, before a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result." (Citation omitted; internal quotation marks omitted.) *Urich* v. *Fish*, 261 Conn. 575, 580–81, 804 A.2d 795 (2002). Furthermore, "[i]t is well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative of other validly admitted testimony." (Internal quotation marks omitted.) *Cadle Co.* v. *Errato*, 71 Conn. App. 447, 466–67, 802 A.2d 887, cert. denied, 262 Conn. 918, 812 A.2d 861 (2002).

A

Exhibit forty-seven, introduced through the plaintiffs' expert, forensic accountant Alan Mandell, contained documents prepared by Mandell and by Mark Austin, a computer consultant, as well as supporting documentation. Following voir dire of Mandell regarding the exhibit, the defendants' counsel objected only to those portions of the document that were not actually prepared by Mandell.[6] The court admitted those portions of exhibit forty-seven to which counsel objected for the limited purpose of demonstrating the basis for Mandell's expert opinion. The remainder of exhibit forty-seven, which includes Mandell's analysis and his determination of the total amount of money the defendants stole, was admitted as a full exhibit without limitation.

The court was well within its discretion to allow Mandell to testify as to the bases of his expert opinion, regardless of whether the documentation on which he relied was itself admissible.[7] See Conn. Code Evid. § 7-4 (b); see also *Carusillo* v. *Associated Women's Health Specialists, P.C.*, 72 Conn. App. 75, 85–86, 804 A.2d 960 (expert opinion regarded as evidence in its own right),

---

[6] After voir dire, during which the defendants' counsel learned from Mandell those portions of exhibit forty-seven that Mandell had himself prepared, counsel framed his objection as follows: "Your Honor, I object to admission of that portion of the exhibit or those portions of the exhibit that were not actually prepared by Mr. Mandell. While I recognize that an expert is permitted to rely on various resources in forming his opinion, it's not established that he can therefore admit any of those sources into evidence unless they otherwise satisfy the requirements for laying a proper foundation. He has admitted that the third document in the packet, for instance, was prepared by Mr. Austin. The second document contains a packet of checks that he admits he doesn't—he didn't prepare. I have no objection with respect to the portion that he actually did put together."

[7] As the defendants have conceded at oral argument that the court properly considered portions of exhibit forty-seven containing Mandell's summaries and conclusions, we need not address the plaintiffs' argument that this hearsay claim was not properly presented to this court for appeal under Practice Book § 67-4 (d) (3).

remanded on other grounds, 262 Conn. 920, 812 A.2d
861 (2002). Most importantly, the defendants' counsel
did not object either to Mandell's testimony regarding
his conclusions as to the amount of money stolen or
to those portions of exhibit forty-seven containing the
gravamen of the plaintiffs' case for theft, including Man-
dell's own analysis of the professional corporation's
business records and his calculations of the total
amount stolen. Either those portions of exhibit forty-
seven to which counsel did not object or Mandell's
testimony was sufficient evidence of the damages
awarded. Thus, because the challenged evidence was
cumulative of other, unchallenged evidence that was
sufficient in itself to support the court's finding as to
the amount stolen, any possible error in the admission
of hearsay evidence was necessarily harmless and does
not warrant reversal of the judgment.

B

Austin prepared the other challenged exhibit, number
seventy-six, when Neikrie twice seized the professional
corporation's computer.[8] The exhibit demonstrated the
alterations Concetta Tripodi had made to computer
records following the initial seizure of the computer.
The court admitted exhibit seventy-six for the limited
purpose of showing that the changes had been made
after the first seizure and before the second, but stated
that it would not consider the substance of the changes.

There is nothing to suggest that the court considered
exhibit seventy-six for any purpose beyond that for
which it allowed the exhibit to be admitted into evi-
dence. Exhibit seventy-six is one piece of circumstantial
evidence of the defendants' theft. Moreover, it is cumu-
lative evidence because both Austin and Benoit testified
without objection that someone had altered the com-
puter information during the period between the first

[8] See footnote 5.

and second seizures of the professional corporation's computer. See *Cadle Co.* v. *Errato*, supra, 71 Conn. App. 466–67. Finally, exhibit seventy-six was not in any way employed by the court to calculate damages. In fact, the court specifically stated in its memorandum of decision that "the exact economic effect of all of the deletions is not clear" and that it considered the deletions as evidence of "unauthorized tampering with the computer records at a particularly suspect time." We accordingly conclude that the court properly admitted and considered exhibits forty-seven and seventy-six and that there was an adequate basis for the damages award.

## II

The defendants next claim that there was an inadequate evidentiary basis for the court to hold Guiseppe Tripodi liable for unpaid rent. The court concluded that Guiseppe Tripodi had failed to make rent payments in the amount of $211,875 during the period after the professional corporation dissolved, but before Guiseppe Tripodi became the owner of the building. We find that there was an adequate evidentiary basis for the court to conclude as it did.

The standard of review for a claim of insufficient evidence is well established. "[W]e must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the [court's judgment] . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the [court] could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." (Internal quotation marks omitted.) *Arnone* v. *Enfield*, 79 Conn. App. 501, 508, 831 A.2d 260, cert. denied, 266 Conn. 932, 837 A.2d 804 (2003).

Following the breakup of the professional corporation, Tadros and Alosco moved their practice to a different location. From April, 2001, when the parties agreed that Guiseppe Tripodi would remain in the practice's former offices, until May, 2003, when Guiseppe Tripodi acquired title to the building, Guiseppe Tripodi remained a tenant of the landlord real estate corporation. He did not, however, pay the full rent that the professional corporation previously had paid. Of the $316,875 in rent due during that period, Guiseppe Tripodi paid only $105,000, leaving an unpaid balance of $211,875. In its memorandum of decision, the court stated that "Tripodi had the opportunity to sublet his new office space or bring other partners into his new practice to help generate more income and defray the rental costs, but he did not do so."

The defendants raise several arguments, all purporting to address the adequacy of the evidentiary basis of the court's decision. Specifically, they claim that (1) there was no evidence adduced at trial that Guiseppe Tripodi possessed authority to enter into a lease unilaterally or to sublease on behalf of the real estate corporation, (2) even if Guiseppe Tripodi had the legal authority to negotiate a lease or sublease, it was unlikely that he could have found a viable tenant due to the fact that the property was the subject of a foreclosure action and (3) the rent charged was inflated to allow for payment of debt service on the real estate corporation's loan. We address each argument in turn.

A

In order for the court to award damages for unpaid rent in this case, it had to make three findings of fact. It had to conclude that Guiseppe Tripodi occupied the office space as a tenant, that he did not pay the rent due and that the rent due was fair market rent. Guiseppe Tripodi's lack of authority to negotiate on behalf of the

real estate corporation is of no consequence. His ability or inability to find a subtenant or partner to help defray costs is irrelevant to the court's decision to award damages. Thus, even if that finding of fact is unsupported by the evidence, it is harmless. Furthermore, the defendants attack only the court's finding that Guiseppe Tripodi could have sublet some of the office space to defray costs. They ignore the court's finding, announced in the same sentence, that Guiseppe Tripodi could have brought on other partners or employees to the same end. The defendants' argument necessarily fails where they dispute one finding of fact and ignore another independently sufficient factual basis for the same outcome.

## B

We need not address the defendants' next argument, that a sublease would have been impracticable due to the foreclosure action, because of our conclusion regarding their first argument.

## C

The defendants' third claim of insufficient evidence is that the evidence did not support the court's conclusion that the rent the real estate corporation charged Guiseppe Tripodi was a fair amount. Specifically, they argue that the rent was inflated to reflect the real estate corporation's debt and that because the parties were not on speaking terms, they did not negotiate a new rental amount after Tadros and Alosco moved their new practice to a different building. We are not persuaded.

The evidence at trial showed that the parties, including Alosco, who did not own an interest in the real estate corporation, and Guiseppe Tripodi, himself, agreed on the rent to be paid by the professional corporation. The real estate corporation did not raise the rent after Alosco and Tadros moved out. Guiseppe Tripodi used

the entire second floor of the office building and was charged the same rent that the professional corporation had been charged for the same space for more than one decade. We can find no reason to disturb the court's finding that the rent to which Guiseppe Tripodi had himself agreed in an arm's length transaction was the fair market rent.

### III

The defendants next claim that the court improperly awarded prejudgment interest on the damages for unpaid rent. There is, however, no analysis of that claim in the defendants' brief. Accordingly, we consider that claim abandoned. E.g., *Updike, Kelly & Spellacy, P.C.* v. *Beckett*, 269 Conn. 613, 642–43, 850 A.2d 145 (2004).

### IV

The defendants' final claim is that the court improperly ordered the garnishment of surplus funds held by the Superior Court clerk following the foreclosure sale of the real estate corporation's building. Specifically, they argue that the court lacked the authority to order the garnishment of funds held by the clerk of the Superior Court. Although it is true in the abstract that a court cannot order the garnishment of funds held by a court official or other state official; see *Herzig* v. *Horrigan*, 34 Conn. App. 816, 821, 644 A.2d 360 (1994); we do not agree that the court's order in this case was a garnishment.

"Issues concerning a court's authority to act are issues of law over which our review is plenary." *State* v. *Perez*, 85 Conn. App. 27, 37, 856 A.2d 452, cert. denied, 271 Conn. 933, 859 A.2d 931 (2004).

Guiseppe Tripodi purchased the real estate corporation's building at auction following the Supreme Court's order of remand to the trial court . See *Tadros* v. *Middlebury Medical Center, Inc.*, 263 Conn. 235, 820 A.2d

230 (2003) (interpreting language granting right of first refusal to a third party as inapplicable in foreclosure situation and approving sale of real estate corporation's building to Tripodi). The clerk of the Superior Court currently holds the proceeds of the sale payable to the real estate corporation, which in turn is one-half owned by Guiseppe Tripodi. Following the entry of judgment for the plaintiffs in the consolidated trial, the plaintiffs successfully moved for a prejudgment remedy[9] ordering the Superior Court clerk to hold the remaining funds left from the foreclosure sale and attaching other assets owned by the defendants[10] in order to satisfy the judgments awarded. The same trial court, *Schuman, J.*, presided over both the consolidated trial and the foreclosure action.[11]

This issue occurs at the intersection of legal and equitable doctrines. On the one hand is the principle of sovereign immunity, which prohibits the garnishment of funds held by court officers. See *Herzig* v. *Horrigan*, supra, 34 Conn. App. 821; 2 E. Stephenson, Connecticut Civil Procedure (3d Ed. 2002) § 107 (e), pp. 23–24. On the other hand, "[t]he distribution of a surplus from a foreclosure sale lies within the equity jurisdiction of the court." *Bryson* v. *Newtown Real Estate & Development Corp.*, 153 Conn. 267, 273, 216 A.2d 176 (1965). The rejoinder is that the funds at issue were "brought into court" and held by the court pending further distribu-

[9] Despite the apparent contradiction in terms, a prejudgment remedy may be granted after the entry of judgment but before appellate disposition in order to protect assets to satisfy the judgment. See *Gagne* v. *Vaccaro*, 80 Conn. App. 436, 451–54, 835 A.2d 491 (2003), cert. denied, 268 Conn. 920, 846 A.2d 881 (2004).

[10] Garnished assets include the Tripodis' real estate holdings and their interest in Guiseppe Tripodi's new entity, Middlebury Surgical, LLC.

[11] The foreclosure action, on remand from our Supreme Court, remains pending, as surplus funds have not yet been distributed. In addition to ordering the garnishment of funds held by the clerk, the court stayed the distribution of funds pending the outcome of these appeals.

tion by order of the court and, as such, the concerns that support the principle of sovereign immunity do not apply. See General Statutes § 49-27.[12]

"[T]he sovereign immunity doctrine rests . . . on the purpose of preventing serious interference with governmental functions and the imposition of enormous fiscal burdens on the state by subjecting its government to private litigation." *Herzig* v. *Horrigan*, supra, 34 Conn. App. 819. In this case, the court simply ordered its clerk to hold, rather than to distribute, funds. Thus, there is no concern with interference with governmental functions or the imposition of any fiscal burdens on the state. In *Segal* v. *Segal*, 86 Conn. App. 617, 637, 863 A.2d 221 (2004), this court recently affirmed the order of the trial court directing the court clerk to pay to a party the proceeds of a partition sale. We concluded that because the clerk came into possession of the proceeds as a direct result of a court order and because it was a one time disbursement that would not cause any administrative difficulty, this was not a garnishment implicating sovereign immunity concerns. Id. That is also the case here. This case, furthermore, is not the typical one of a third party garnishing his debtor's assets. The parties in interest in the foreclosure action are the same parties in interest in the consolidated cases we affirmed in parts I through III. We accordingly conclude that the court's order with respect to the funds from the foreclosure sale was not a garnishment of funds held by the court clerk and that the court had the authority to order the clerk to hold rather than to distribute the funds pending the outcome of this and any further appeal.

---

[12] General Statutes § 49-27 provides in relevant part: "The proceeds of each such [foreclosure] sale shall be brought into court, there to be applied if the sale is ratified, in accordance with the provisions of a supplemental judgment then to be rendered in the cause, specifying the parties who are entitled to the same and the amount to which each is entitled. . . ."

The judgments are affirmed.

In this opinion the other judges concurred.