# NATIONAL PUBLISHING COMPANY, INC. *v.* HARTFORD FIRE INSURANCE COMPANY
## (AC 23651)

Dranginis, Flynn and Dupont, Js.*

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued November 16, 2005—officially released January 27, 2006**

** January 27, 2006, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*James V. Somers*, with whom, on the brief, were *Daniel P. Scapellati* and *John B. Farley*, for the appellant (defendant).

*Nancy Fairchild Sachs*, with whom, on the brief, were *Russell J. Berkowitz* and *Eric G. Blomberg*, for the appellee (plaintiff).

*Opinion*

FLYNN, J. The defendant, Hartford Fire Insurance Company (Hartford), appeals from the judgment of the trial court, rendered after a jury verdict awarding $1,100,314.37 in damages to the plaintiff, National Publishing Company, Inc. (National), for National's insurance claim for losses and damage sustained as a result of theft and vandalism. The judgment reflected a $238,533.79 remittitur[1] from the jury's award of $1,338,848.16, which the plaintiff accepted. We note also that the amount originally awarded by the jury, before the court ordered the remittitur, was nearly $500,000 less than the $1.8 million in damages for which National sought recovery. On appeal, Hartford claims that the court improperly denied its postverdict motions for judgment notwithstanding the verdict and to set aside

---

[1] The court explained that the remittitur was for $100,000 in rental damage and $138,533.79 for expired computer leases. During cross-examination, National's expert, Eric Von Brauchitsch, admitted that these charges erroneously had been included on his summary spreadsheet.

the verdict. Specifically, Hartford claims that the court should have granted its motions for the following reasons: (1) National failed to establish any damages by failing to produce evidence (a) "that it incurred damages," (b) of the "period of restoration," or (c) that "any of the claimed expenses qualified as either 'normal operating expenses' or 'extra expenses' under the policy"; (2) the court improperly admitted a summary spreadsheet into evidence without a proper foundation; (3) the court failed to charge the jury on Hartford's special defense that National failed to give proper notice of its claim pursuant to the policy; (4) the court improperly denied Hartford's motion for a mistrial after National's counsel made inflammatory remarks during closing argument; and (5) the court improperly excluded evidence regarding a prior felony conviction of National's principal, Paul Cohen.[2] We affirm the judgment of the trial court and begin by summarizing our reasoning.

As to Hartford's first claim, we conclude that National did establish some damages, which, as reduced by the court's remittitur, properly were found by the jury on the basis of the testimony of National's expert public adjuster as well as other evidence in the case. We decline to review Hartford's claim that National offered *no evidence* of the period of restoration for which the policy provided coverage because that never was raised in Hartford's motion for a directed verdict, as our rules of practice require. Further, we conclude that any foundational objections to National's expert testimony should have been made prior to the expert's testimony

---

[2] At the outset, we note that Hartford did not comply fully with our rules of practice. Practice Book § 63-8, as amended effective November 1, 2002, requires an appellant to order and file an official transcript and an electronic version of the transcript. See also Practice Book § 63-8A (a). Section 63-8 also requires that the appellant "either before or simultaneously with the filing of the appellant's brief . . . file with the appellate clerk one *unmarked*, nonreturnable copy of the transcript . . . ." (Emphasis added.) Practice Book § 63-8 (e) (1).

as to total damages, not at the end of the case; once admitted without objection, this testimony properly was considered by the jury, which also determined its weight and credibility. We also reject Hartford's claim that National offered no evidence as to which of the claimed damages fell under the business income-operating expense category and which fell under the extra expense category. The testimony of National's expert in and of itself was sufficient to do this.

As to Hartford's second claim, we conclude that there was a proper foundation for admission of the summary spreadsheet and that Hartford was not harmed by the court's restriction of its use to nonsubstantive purposes.

As to Hartford's third claim, we conclude that even if we were to assume, without deciding, that the court improperly refused to charge on the issue of notice as set forth in Hartford's sixth special defense, National met its burden of proving that Hartford was not prejudiced by the timing of National's notice, and Hartford failed to demonstrate that it was harmed by the court's refusal to charge on the issue of notice.

As to the remaining claims, we conclude that the court did not abuse its discretion in denying Hartford's motion for a mistrial because the summation remarks of National's counsel were not improper. We also hold that the court did not abuse its discretion in excluding evidence of the twenty-five year old conviction of National's president on the grounds that it was too remote in time, too prejudicial and might distract the jury from the issues in the case.

The following facts, which the jury reasonably could have found, and the procedural history of the case, are relevant to our resolution of the issues on appeal. In 1985, Cohen founded National, a publishing company, which published low cost, freestanding newspaper inserts for companies such as Wal-Mart Stores, Inc.,

Colgate-Palmolive Company and Kraft Foods Company, to name but a few. National's unique computer system contained individualized instructions for printing coupons for each of its many clients, and it created thousands of production grids, which were transmitted, via computer, to 13,000 newspapers around the United States. The business was sui generis. National was unique in terms of the product it produced, the services it provided, its distribution area, its customer base, its market, the variety of newspapers and publications it offered to its clients, and its computer software and database, which had been developed in-house and individually programmed by Eric Richmond, an associate of Cohen, before Richmond left National. Cohen estimated that National's database had a conservative value of $5 million but could have been worth as much as $20 million. Apart from Cohen's opinion as to the value of the database, an independent consultant also concluded that National's database was a valuable asset that should be listed on its balance sheet. National's sales increased from $300,000 in 1992 to $5.7 million in 1994, and, in 1993, it had a triple A-1 credit rating from Dun and Bradstreet.

By 1994, Cohen's associates, Karen Clark and Richmond, were running the day-to-day operations of National, and Cohen resided in Florida from December through May, and in Westport during the remainder of the year. Unhappy with National's mounting debt, their compensation and the prospects of Cohen's moving National to Florida, Clark and Richmond wanted to take control of the company, and, at a December 30, 1994 meeting, Cohen was confronted by a group of employees. Two of these employees, Ralph McCarthy and John Moore, "two big guys," blocked his exit. Cohen did not know what was going on, and he was not informed as to the purpose of the meeting. Cohen requested to speak privately with Clark and Richmond,

but they declined, and Cohen sought to leave the meeting. As he was leaving, he was handed a letter from Clark, Richmond and other upper management personnel, which he read that same day after boarding a pre-scheduled return flight to Florida. In this letter, Clark, Richmond and others demanded approximately $1 million in compensation, majority ownership of National and Cohen's agreement to a voluntary reorganization of National. The letter further threatened that if their demands were not met, they would "force" National into involuntary bankruptcy. Two days later, Cohen received a letter of resignation from Richmond and Clark. Clark and Richmond formed a competing company, Media Management Creative Marketing Services, with several other individuals who had left National and joined Clark and Richmond.

On January 3, 1995, after returning to Connecticut, Cohen went to National and discovered that the offices had been ransacked. Computers, computer equipment, software, furniture, files, financial records and other business records were missing. A police report was filed, but Cohen did not become aware, until January 18, 1995, or later, that National's computer system had been sabotaged or that many unauthorized checks had been written. The full extent of the computer sabotage was not realized for many months.

Cohen did not immediately report the loss to Hartford because he did not know who National's insurance carrier was or whether National even had insurance because these documents were among the many missing or stolen files. However, Cohen later became aware of National's coverage by Hartford when, in a notice dated January 25, 1995, Hartford informed National that its policy was being canceled for nonpayment of premium. On January 30, 1995, Cohen contacted the insurance agent listed on that notice, J. M. Layton & Company (J. M. Layton), and spoke with its chief executive offi-

cer, David Woodward. Cohen informed Woodward of the loss and requested a copy of National's insurance policy. Woodward testified that he did not report the loss immediately to Hartford because it was a property claim and not a liability claim. He requested that Cohen put the claim together so that J. M. Layton could submit it to Hartford. Woodward also met with Cohen at National and looked over the premises. After receiving a letter from Cohen's attorney, J. M. Layton filed its first report of loss with Hartford on March 19, 1995. Despite repeated requests from National for an advance of its insurance proceeds, Hartford did not investigate the claim until September, 1995.

Because the extensive computer damage made it virtually impossible for National to earn any revenue, it was forced into bankruptcy in March or April, 1995, which it later converted to a chapter 11 reorganization. In July, 1995, National hired Eric Von Brauchitsch of New England Adjusting Company to assist with the processing of its insurance claim. Von Brauchitsch was approved by the United States Bankruptcy Court as National's public adjuster for its insurance claim. Although certain proof of loss forms had been requested by National in February, 1995, they never were sent and, in August, 1995, Von Brauchitsch prepared his own proof of loss forms and sent them to Hartford. On October 24, 1995, Von Brauchitsch hand delivered to Hartford the supporting documents for the proof of loss forms. Hartford rejected the proofs of loss and, because the claim could amount to millions of dollars, started a special investigation.

After many months of attempting to collect on its insurance claim, National filed an action against Hartford in January, 1997, claiming that Hartford had breached its contract by failing to pay National's claim under its business insurance policy. In its answer, Hartford denied that it had breached the policy and set forth

eighteen special defenses. Following a three week trial, the jury returned a plaintiff's verdict, awarding damages in the amount of $1,338,848.16, which included $914,530.68 for extra expenses, $414,317.48 for business income losses and $10,000 for employee dishonesty losses. The jury further specifically found on written interrogatories (1) that Hartford had failed to prove that National had violated the policy by intentionally concealing or misrepresenting material facts and (2) that National had complied with the conditions of the policy requiring its cooperation in the investigation.

Following the verdict, Hartford filed motions for judgment notwithstanding the verdict and to set aside the verdict, claiming that National had presented no evidence of losses, that Hartford's special defenses of intentional misrepresentation and fraud had been satisfied, that certain claimed expenses were barred and should be eliminated from the damages award, that the court improperly admitted a spreadsheet into evidence without a proper foundation, that the testimony of National's expert, Von Brauchitsch, lacked foundation, that remarks made by National's counsel during closing argument were inappropriate and that the court improperly charged the jury on the issue of employee dishonesty and Hartford's misrepresentation defense. The court denied Hartford's motions, but it did order a remittitur in the amount of $238,533.79, reducing the jury's business income award to $175,783.69. The extra expenses portion of the jury award remained unchanged. Accordingly, after the remittitur, the total damages award was $1,100,314.37. National accepted the remittitur, and Hartford filed this appeal.[3]

---

[3] Hartford also filed a motion for articulation with the trial court, which was granted. The court, however, did not articulate its decision fully, and Hartford filed a motion for review with this court. We granted that motion and ordered the trial court to further articulate its decision, and it issued a further articulation.

On appeal, Hartford claims that the court improperly denied its motions to set aside the verdict and for judgment notwithstanding the verdict.

"[Appellate] review of a trial court's refusal to [set aside] a verdict or to render judgment notwithstanding the verdict takes place within carefully defined parameters. We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached [its] conclusion. . . . A jury's verdict should be set aside only where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles. . . . A verdict should not be set aside where the jury reasonably could have based its verdict on the evidence." (Internal quotation marks omitted.) *U. B. Vehicle Leasing, Inc.* v. *Davis*, 90 Conn. App. 206, 213–14, 876 A.2d 1222 (2005). "The trial court's decision is significant because the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence. Moreover, the trial judge can gauge the tenor of the trial, as we, on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury. . . . Our task is to determine whether the total damages awarded falls somewhere within the necessarily uncertain limits of fair and reasonable compensation in the particular case . . . ." (Internal quotation marks omitted.) *Doe* v. *Thames Valley Council for Community Action, Inc.*, 69 Conn. App. 850, 877–78, 797 A.2d 1146, cert. denied, 261 Conn. 906, 804 A.2d 212 (2002).

# I

## A

Initially, Hartford claims that National failed to introduce any evidence to establish that it incurred damages. It argues that National "did not . . . introduce any factual evidence at trial to establish a foundation for [its] damages claims. It did not introduce any canceled checks, invoices, receipts, bills or other documentation to support these claims. It also did not introduce any testimony through any fact witness to lay a foundation for these claims [and, therefore] the evidence in support of [its] claims was legally insufficient." National rebuts this claim by citing Von Brauchitsch's testimony as to all damages claimed and by arguing that many witnesses testified as to the damages incurred and that it did, in fact, also introduce documentary evidence in support of its damages claims. We agree with National.

In this claim, it is important to note that Hartford does not contest that some of the evidence in support of National's claims for damages was insufficient; rather, Hartford claims that National offered *no evidence* in support of its claimed damages.[4] As clearly expressed

---

[4] Hartford reiterated this claim when questioned by Judge Dranginis at oral argument before this court:

"The Court: In . . . the appendix to the reply brief, there are all kinds of invoices and [other items], and my suspicion is that there was discovery in this case.

"[The Defendant's Counsel]: Oh, yes, Your Honor. There was discovery. Sure.

"The Court: But you never [received] any invoices?

"[The Defendant's Counsel]: Well.

"The Court: . . . I'm asking you this because your opposing counsel in the brief talks about exhibit numbers, testimony of a variety of witnesses . . . . I did have the opportunity to look at some of the testimony that is contained in the appendices and in your reply brief showing some of the invoices, and my guess was that some of them had evidence stickers on them, and that you had a pretrial date where you had to premark exhibits . . . .

"[The Defendant's Counsel]: Sure. That's absolutely correct. I think probably much of the reason for the disparate positions of the parties as to what the evidence proved was a disparate notion.

by the trial court in its second articulation, "[National] presented Von Brauchitsch, a licensed insurance adjuster, who explained the definition of operating expenses and extra expenses and testified that he had determined that all the items listed on exhibit 174 were valid operating expenses and extra expenses.[5] Exhibit 174 was not substantive evidence that the listed items were such expenses, but Von Brauchitsch's testimony was, and it was based on his examination of the claimed items. While Hartford vigorously cross-examined Von Brauchitsch on the vast majority of these claims, and sometimes with good effect, it did not question him on every item, and it did not call any witnesses of its own on this subject. Thus, there was testimonial support for each of the claimed expenses by [National's] expert, some of which was supported by other witnesses such as Cohen, and it was the proper province of the jury in light of that testimony and the cross-examination to determine what expenses qualified."

In addition to the explicit findings of the trial court, our own review of the testimony and exhibits in this case reveals that Hartford's claim that National failed to offer "any evidence" of its losses has no merit. We set forth some of the evidence offered at trial. Nicholas

---

"The Court: No. The allegation is there were no facts submitted as a foundation for the compilation document that was testified to by the plaintiff's expert.

"[The Defendant's Counsel]: That's right.

"The Court: Okay. That's what you alleged in your brief.

"[The Defendant's Counsel]: That's right. . . .

"The Court: You might not agree with the facts or you might say that the [jury] shouldn't have credited them . . . . But the brief seems to indicate that there were no facts that supported the document.

"[The Defendant's Counsel]: And that's because we believe there is no evidence to establish either a foundation for the document or the claims that were made by the plaintiff."

[5] Exhibit 174 was a summary spreadsheet, prepared by Von Brauchitsch, listing each individual bill, invoice and expense. It also broke down these expenses by category, as either an operating expense or an extra expense. This exhibit will be explained more fully in part II.

M. Simak, a business systems consultant and chief executive officer of N.M.S. Solutions Group, Inc., testified[6] that he was hired by National to oversee the assessment and recovery process stemming from the theft of computer equipment and vandalism to the in-house developed computer communications databases, hardware, software and insert system. In short, he was to assess what was wrong with the computer system and to determine what was required to put the system back into production mode. He worked seven days a week, eighteen or nineteen hours a day to complete this assessment. Simak testified that he had some invoices for this work in front of him, one of which totaled $158,700.16, but that the grand total of all invoices was approximately $350,000. The invoices totaling $158,700.17 and additional invoices showing a revised total of $165,491.07 previously had been introduced into evidence.

Michael Confortini, an independent contractor from MRC Direct, testified that he brought many clients to National because National was reaching a market that other publishers were not reaching. After the events of early January, 1995, Confortini met with Cohen three or four times per week to discuss strategies to get National operational again. They also met with various potential investors, and Confortini stayed in constant contact with clients in an effort to reassure them. Confortini further testified that he billed National $110 per hour, and he offered testimony concerning his invoices, which were dated from January through September, 1995, and totaled $76,780. These invoices previously had been admitted into evidence.

Daniel Delventhal, the owner of Connect Computer Corporation (Connect), testified that his company was

---

[6] Simak's testimony was offered via a video deposition that was played for the jury.

hired by National to rebuild its computer network, to replace things that were missing and to help get the business going again. Connect also provided National with a receptionist and a bookkeeper. Delventhal further testified that Connect normally charged a rate of $100 per hour, but that it had different rates for more difficult work and that Connect had worked approximately 1000 hours trying to repair National's computer network, at an approximate cost of $100,000. Delventhal further testified that he felt pressured by Cohen to inflate his bill to $125,000, but that the higher bill still was fair and reasonable based upon the work performed. In the end, Connect submitted two revised invoices to National, one in the amount of $22,911.74 and the other in the amount of $88,242.35, for a total bill of $111,154.09. These bills were in evidence.

Kevin Kaster, the owner of Kaster Moving Company (Kaster), testified that he had moved the belongings of National into Kaster's storage facility and that some of National's equipment continued to be stored there at the time of trial. He further testified that as of November, 1997, National owed Kaster $93,250 for moving and storage charges from approximately November, 1995, to November, 1997.[7] Kaster's invoices were admitted into evidence as defendant's exhibit eighty-four. Although some of those items were personal belongings of Cohen, there were also cartons, computers and computer parts that belonged to National. Kaster also testified, however, that his company had a separate account for Cohen.

Irving Ayash, the president of Ideal Management, Inc., testified that his company secures financing for companies in need and that National was one of those companies. For his services, he billed National a one time fee of $25,000. Cohen also testified to this.

---

[7] We recognize that some of these charges fell outside of the period of restoration.

Cohen further testified that many of National's computers and related equipment were missing or stolen, that related leasing documents were missing or stolen, that software was missing or stolen, that unauthorized checks had been written and most of National's money was missing from its bank accounts, that business files and financial records were missing, that National's payroll had been diverted, that databases had been sabotaged, rendering National unable to produce its advertising product, that he had paid approximately $150,000 from his personal funds to cover immediate operating expenses and payroll and that several computer consultants had been hired to try to fix the computer system. He testified that National had been forced into bankruptcy, that Neil Crane initially had been hired as its bankruptcy attorney and that National had given him a check for $30,000 to cover some of the cost involved in converting National's involuntary bankruptcy into a reorganization. That check and a statement showing the fees for all of Crane's representation, totaling $157,300.55, was in evidence. Cohen also testified that National's landlord was Independent Jewelers Organization and that National was having difficulty paying its rent, resulting in eviction proceedings against National commencing in February, 1995. The landlord's invoice was in evidence as defendant's exhibit thirty-one. It showed rent due for December, 1994, through April, 1995, in the amount of $3161.60 per month, and from May through July, 1995, in the amount of $3250 per month, plus a charge of $373.35 due for fuel.[8] These charges totaled $25,931.25.

Cohen testified that Von Brauchitsch had been hired to assist National with all aspects of its insurance claim because Cohen had no experience in this area, that

---

[8] An additional charge of $100,000 for unauthorized alterations to the building was listed on the invoice, which became part of the remittitur ordered by the court.

he had provided Von Brauchitsch with all checking account statements, copies of all canceled checks, bills and invoices, and that Von Brauchitsch had been given access to all of National's files for purposes of gathering the information necessary to make a claim to Hartford on National's behalf, that Von Brauchitsch had been appointed as National's insurance adjuster by the United States Bankruptcy Court, that Von Brauchitsch had been given the authority to serve as National's "mouthpiece" for its insurance claim and that Cohen had expected Von Brauchitsch to use his independent judgment in assessing and submitting National's claim to Hartford. Von Brauchitsch was authorized to act on behalf of National in all aspects of the insurance claim, including its quantification. As testified by Cohen, Von Brauchitsch "was and always has been and is the boss."

Von Brauchitsch, National's undisputed and stipulated expert,[9] testified that he is a licensed public insurance adjuster and that he had handled approximately 1000 claims on behalf of his company, New England Adjusting Company, since 1990 and approximately 200 claims specifically against Hartford. Prior to that time, he was the vice president of Nutmeg Adjusters, where he had assisted people in the preparation of insurance claims in all aspects. He explained to the jury, without objection, the difference between operating expenses and extra expenses, and testified that those two types of expenses frequently cross over and overlap. He testified that he had met with various individuals and computer experts to assess the damages at National, to go over invoices and to categorize the expenses. He testified that he had developed a spreadsheet listing the categorized damages, and he explained that this is a typical

---

[9] The following colloquy occurred at trial:

"[The Plaintiff's Counsel]: You will stipulate that [Von Brauchitsch] is an expert?

"[The Defendant's Counsel]: Yes."

way in which adjusters keep the voluminous records of damages. Von Brauchitsch also testified that in his expert opinion, the total value for National's operating expenses, including open leases, was $449,490.09 and that the extra expenses incurred by National as a result of the loss were $1,374,116.04 and, further, that he had relied on invoices and information provided by National in arriving at that opinion.[10] This testimony was offered without objection. Von Brauchitsch then was asked on direct examination to explain many of the expenses listed on the spreadsheet. During cross-examination, Von Brauchitsch testified that his files were taken from him throughout the course of National's claim and that some of the invoices that were relied on in developing the spreadsheet and finalizing his figures were missing, but that he did have the majority of the invoices in his file with him at trial.

In relation to Von Brauchitsch's testimony, Hartford also argues that it lacked foundational support and

---

[10] The following colloquy occurred at trial:

"[The Plaintiff's Counsel]: Mr. Von Brauchitsch, based on your now being stipulated as an expert in this matter, did you arrive at an opinion as a public adjuster as to the total operating expenses that you feel [National] incurred as a result of the loss sustained at their premises back in late December of 1994 through January of 1995?

"[The Witness]: Yes.

"[The Plaintiff's Counsel]: Can you tell the jury what your opinion is?

[The Witness]: You want the total?

"[The Plaintiff's Counsel]: Yes.

"[The Witness]: The total value for the operating expenses, which also includes open leases that the company is responsible for, is $449,490.09.

"[The Plaintiff's Counsel]: And sir, did you also rely on the same invoices and information provided to you by the insured in arriving at your opinion as it relates to the total extra expenses that you opine that [National] incurred under the extra expense section of the [policy]?

"[The Witness]: That is correct.

"[The Plaintiff's Counsel]: Can you tell the jury what your opinion is as it relates to the total amount of extra expenses incurred by [National] as a result of the loss that took place between the end of December of 1994 through early 1995?

"[The Witness]: It was $1,374,116.04."

should not have been considered as substantive evidence because the actual invoices, checks and bills about which he offered testimony were never introduced into evidence and because he did not state that "he had 'examined the claimed items' and determined that they were in fact incurred, and for the purposes claimed. Thus [Hartford argues that] there was no evidence that he had personal knowledge, and so his testimony did not provide foundational, factual evidence to establish losses." On the basis of Von Brauchitsch's testimony and the submitted documentary evidence, we conclude that this argument simply is not supported by the record. We further conclude that if Hartford had an objection based on some foundational inadequacy regarding Von Brauchitsch's testimony, the time to have objected would have been before Von Brauchitsch offered such testimony for the jury's consideration.[11] Here, not only did Hartford stipulate to Von Brauchitsch's being an expert, but it listened, without objection, to his testimony regarding the losses sustained by National and never asked that any part of it be struck.

"The mere fact that a witness has been qualified as an expert in a particular field does not itself give the

---

[11] We note that the court conducted a hearing on May 8, 2002, before Von Brauchitsch testified. The hearing concerned his testimony and the use of the spreadsheet before the jury. During that hearing, Hartford's counsel specifically asked the court if it "would entertain objections from [him] to the extent that there is no factual basis for Von Brauchitsch's conclusion[s] [and whether he could] object as to each item that is on [the spreadsheet] because [his] position will be that there is no basis for it unless—there is no basis for its admissibility unless and until [Von Brauchitsch] determines or provides evidence that it is compensable under the policy." The court responded that it was "going to have to wait and see how this comes up [because the court had not yet] heard any of [Von Brauchitsch's] testimony and [the court] guess[ed] [that it was] going to have to feel [its] way through it a little bit." The court then explained that "it [was] fairly basic that there had to be a factual basis for [Von Brauchitsch's] opinion." From a reading of the transcript of Von Brauchitsch's testimony, it is clear that although counsel objected on foundational grounds to the spreadsheet's being admitted as a full exhibit, he offered no foundational objections to Von Brauchitsch's testimony.

expert information needed to state an opinion relevant to the case. There remain two additional elements before that opinion may be rendered:

"1. A knowledge of the facts of the case, to which the expert's training and experience may then be applied . . . .

"2. The perceived reliability or trustworthiness of the principles and theories from the field of expertise which the expert employs to render the opinion . . . .

"The opinions of experts must be based upon facts which have been proved, assumed, or observed, and which are sufficient to form a basis for an intelligent opinion." 17 L. Russ & T. Segalla, Couch on Insurance (3d Ed. 1998) § 252:29. "Opinion evidence should be accompanied by a statement of the facts on which it is based, and as a general rule, an expert must state facts from which the jury may draw [its] conclusions. Conversely, a witness qualified as an expert may not only testify as to the conclusions based upon his skill and knowledge, but also as to the facts from which such conclusions are drawn. . . . [W]here the factual foundation for an expert opinion is not fully disclosed, it cannot be assailed upon appeal if accepted by the jury as sufficient in weight and credibility to support the verdict." Id., § 252:32.

"The fact that an expert opinion is drawn from sources not in themselves admissible does not render the opinion inadmissible, provided the sources are fairly reliable and the witness has sufficient experience to evaluate the information. . . . An expert may base his or her opinion on facts or data not in evidence, provided they are of a type reasonably relied on by experts in the particular field. . . . This is so because of the sanction given by the witness's experience and expertise. . . . An expert may give an opinion based on sources not in themselves admissible in evidence, provided (1)

the facts or data not in evidence are of a 'type reasonably relied on by experts in the particular field,' and (2) the expert is available for cross-examination concerning his or her opinion. . . . Thus, experts can give their opinion as to fair market value by reference to hearsay information as to comparable sales. . . . Cost estimates can be based on data obtained from others [and in] *State* v. *Wilson*, 188 Conn. 715, 722–23, 453 A.2d 765 (1982), a jeweler, without personal inspection, was permitted to give testimony based solely on a written inventory prepared by the owners." (Citations omitted.) C. Tait, Connecticut Evidence (3d Ed. 2001) § 7.9.4 (a), pp. 534–35; see D. Faulkner & S. Graves, Connecticut Trial Evidence Notebook (2d Ed. 2004) E-31.

"An expert witness with firsthand knowledge of the facts can always base an opinion on those facts. . . . [F]acts personally observed by an expert witness are not hearsay and may be used both for the basis of the expert's opinion and to prove the truth of the matter recited." C. Tait, supra, § 7.9.2, p. 533. "The distinction between so-called 'fact' and 'opinion' is not a difference between opposites or contrasting absolutes, but instead a mere difference in degree with no bright line boundary." 1 C. McCormick, Evidence (5th Ed. 1999) § 11, pp. 45–46. "When [a] witness . . . bases his testimony partly upon firsthand knowledge and partly upon the accounts of others, the problem calls for a practical compromise. . . . In short, when [a] witness testifies to facts that he knows partly at first hand and partly from reports, the judge should admit or exclude according to the overall reliability of the evidence." Id., § 10, p. 43, citing *Hunt* v. *Stimson*, 23 F.2d 447 (6th Cir. 1928) (sales manager of lumberyard permitted to testify as to amount of lumber on hand on basis of his estimates from inspection and tallies made by others).

We conclude that Von Brauchitsch was both an expert and a fact witness in this case. Despite his status

as a stipulated expert, he had made a factual investigation of National, its operations, its losses and its attempts to restart operations. With the departure of many key personnel, his official appointment by the United States Bankruptcy Court and the months he spent at National, Von Brauchitsch probably was the only person with sufficient factual knowledge of the issues qualified to testify regarding National's claims against Hartford.

Von Brauchitsch testified that he met with key personnel, such as Cohen; Simak; Stewart Jameson, a certified public accountant; Susan Guthrie, who was a consultant and an attorney; Steve Jackson, another consultant; Glen Belush, another certified public accountant who had worked with National prior to its claim; and others. He testified that he had to sit down and learn how the company operated, that he was the person "calling the shots" in relation to the claim, that he was given financial statements, that he had numerous meetings with the consultants and accountants regarding every aspect of the loss, that he went through the invoices and discussed their contents with various individuals at National to make sure that he was satisfied that the invoices should be included in the claim and that this process took months. He worked very closely with key personnel and consultants over a period of several months, learned how the company operated, met with personnel regularly, discussed their invoices with them, questioned their expenses and their roles in relation to assessing the losses and their attempt to restore the business and actually assigned tasks to certain individuals related to his assessment of National's losses. From the testimony of Von Brauchitsch and others, it is clear that he actively participated in and directed the damage assessment and that he personally witnessed the attempt to get National up and running over a period of several months. From this standpoint,

he was testifying both as a fact witness and as an expert. See C. McCormick, supra, § 10, p. 43.

As to Hartford's argument that Von Brauchitsch did not state that "he had 'examined the claimed items' and determined that they were in fact incurred and for the purposes claimed," we further conclude that the record does not support this contention. Von Brauchitsch specifically testified that he had "numerous meetings, going over with the consultants and accountants every aspect of the loss," that he did go through the invoices and that he "discuss[ed] the contents of the invoices with the various individuals at [National] to make sure that [he was] satisfied that the invoices should be included as part of the claim." Although Von Brauchitsch did testify that he did not question each and every person as to each and every invoice, he certainly provided some in-depth testimony, especially during cross-examination and redirect examination, as to many of the invoices, their circumstances and their purpose, which demonstrated that "he had 'examined the claimed items' and determined that they were in fact incurred and for the purposes claimed."

In addition, we note that even without Von Brauchitsch's testimony, the evidence that we have cited totals nearly $1 million. On this basis and on the basis of all of the previously discussed evidence, we simply cannot find merit in Hartford's claim that National "did not introduce *any evidence* in support of its claim that it incurred damages . . . . ." (Emphasis added.) Certainly, as stated previously, there was at least *some evidence* in support of National's claim, which, on appeal, we are required to view in the light most favorable to sustaining the jury's verdict. Accordingly, we conclude that the court properly denied Hartford's motions to set aside the verdict and for judgment notwithstanding the verdict on the basis of this claim.

## B

Hartford next claims that the court improperly denied its motions because National failed to introduce any evidence to establish the period of restoration as required by its insurance policy. Hartford argues that National "had the burden, under the terms of the insurance contract, of proving both the beginning date and the ending date of the period of restoration, as well as the burden of proving that the alleged losses were incurred during that period." Hartford further argues that National failed to introduce any evidence to establish this period. National argues that this issue was not preserved because Hartford did not raise this as a ground for its motion for a directed verdict.[12] We agree that the issue was not preserved.

Practice Book § 16-37 provides in relevant part: "[A] party who has moved for a directed verdict may move to have the verdict and any judgment rendered thereon set aside and have judgment rendered in accordance with [its] motion for a directed verdict . . . ." A motion for a directed verdict, grounded on the same reasoning, is a prerequisite to the filing of a motion to set aside the verdict. See *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 49, 717 A.2d 77 (1998). Although our Supreme Court recognized that "a trial court has the inherent authority to set aside a verdict even where no motion to set aside the verdict has been filed . . . [t]his does not mean . . . that [the defendant] need not have raised issues arising during the trial, in a motion for a directed verdict, in order for the appellate tribunal to review the trial court's denial of a motion to set aside the verdict." (Citations omitted.) Id., 49 n.44.

---

[12] National also argues that even if we were to conclude that the issue was preserved, Hartford's claim is "factually and legally baseless," as there was substantial testimony that the period of restoration was twelve months.

Hartford's motion for a directed verdict stated: "[The] defendant, [Hartford], hereby moves this court to direct a verdict in its favor as to [National's] second amended complaint dated March 18, 2002. [National] failed to meet its burden of proof and establish a prima facie case for breach of an insurance contract. Specifically, [National] failed to prove that it is entitled to recover under the business income provision of the policy because it failed to come forward with any evidence to prove 'net income.' Moreover, the evidence produced by [National] to establish 'continuing normal operating expenses including payroll' was speculative, unreliable and insufficient to support the alleged losses. Furthermore, [National] failed to prove its entitlement to proceeds under the policy's extra expenses and employee dishonesty sections of the insurance policy. As such, [National] has not made out a prima facie case, and this court should direct a verdict for [Hartford]."

Nowhere on the face of its motion, did Hartford claim as a ground for its motion that National failed to prove the period of restoration or that its losses occurred during that period. Although in its reply brief to this court, Hartford argues that this ground, although not stated on the face of the motion for a directed verdict, was briefed adequately in its memorandum in support of the motion, our review of the memorandum reveals otherwise.[13] Accordingly, we decline to review this unpreserved claim.[14]

---

[13] During oral argument before this court, Hartford argued that it had raised this issue "obliquely" in its memorandum in support of its motion for a directed verdict. "Where a claim receives only cursory attention in the brief without substantive discussion, it is deemed to be abandoned." (Internal quotation marks omitted.) *Golden* v. *Johnson Memorial Hospital, Inc.*, 66 Conn. App. 518, 538, 785 A.2d 234, cert. denied, 259 Conn. 902, 789 A.2d 990 (2001). "These same principles apply to claims raised in the trial court." *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003).

[14] Furthermore, despite our holding that this issue was unpreserved, our review of the record for purposes of other issues raised in this appeal has revealed that there was evidence of the period of restoration. Von Brau-

### C

Hartford next claims that National failed to prove that "any of the claimed expenses qualified either as 'normal operating expenses' or 'extra expenses' under the policy." It argues that "there simply was no evidence at all from the plaintiff as to the purpose of the expenses." It further argues that the testimony of Von Brauchitsch did not establish that any of the claimed losses either were operating expenses or extra expenses because National "did not establish a foundation through [Von Brauchitsch] because it did not show that he had personal knowledge with respect to the various expenses." We do not agree. Further, we reiterate that if Hartford had wanted to assert some foundational inadequacy regarding Von Brauchitsch's testimony, the time to have done so would have been before Von Brauchitsch offered such testimony and opinion, not after the testimony was admitted and one or both sides had rested.[15] Once admitted before the jury, it could be considered and weighed by the jury in reaching its verdict.

We discussed in part I A Hartford's claim that the testimony of Von Brauchitsch lacked foundation in relation to the losses suffered by National. In this claim, Hartford reiterates its claim that Von Brauchitsch's testimony lacked foundation, but it also claims that National failed to prove that any of the claimed

---

chitsch testified that the period of restoration begins "with the date of direct physical loss or damage . . . and ends on the date when the property . . . should be repaired, rebuilt [or] replaced . . . ." He stated that the date of loss in this case was approximately December 30, 1994, and that the period of restoration was twelve consecutive months, which was the maximum allowed under the policy. He also testified that the business never was able to resume because the business did not have the funds to continue assessment and recovery. Additionally, Simak testified that at the time he stopped his consulting work in the fall of 1995, he estimated that it still would take six to nine months of work to get the computer fully operational.

[15] See footnote 11.

expenses qualified either as normal operating expenses or extra expenses under the policy. Insofar as additional analysis may be warranted as to the foundation for Von Brauchitsch's testimony in categorizing the damages, we set forth the following.

During the trial, Von Brauchitsch specifically testified that each of National's claimed expenses either was a normal operating expense or an extra expense as specifically listed and designated on the spreadsheet that he had prepared after familiarizing himself with National, speaking with key individuals and gathering bills, invoices and other important information. He further testified as to the exact total of each of these categories and explained most of the listed items and their purpose. He also defined "operating expenses" and "extra expenses."[16] Specifically, he stated, without objection: "Continued operating expenses are the expenses that the company continues to incur even though the business might be down. These are expenses that the company would have incurred had there not been a loss versus the extra expenses which would be expenses that the company would incur as a result of the loss, and had there not been a loss these expenses would not be incurred." Von Brauchitsch then explained: "Operating expenses would be expenses that a company might incur such as payroll, utilities, rent, taxes, licensing. Just to keep your normal standard operations going. . . . An extra expense would be an expense such as if the business had been destroyed by fire and they had to take the business and move to another location and temporarily set up shop or bring in a consultant if there is a computer claim to try to get the computer system up and running. If they need additional supplies, that would be an extra expense."

[16] "When an insurance contract term is not defined and the parties dispute its intended meaning, an expert witness may properly testify as to an opinion on how the contract language should be interpreted." 17 L. Russ & T. Segalla, supra, § 252.82.

As set forth in part I A, Von Brauchitsch testified that he met with key personnel, such as Cohen, Simak, Jameson, Belush, Guthrie, Jackson and others. He testified that he was given the financial statements of National, that he had numerous meetings with the consultants and accountants regarding every aspect of National's loss, that he went through the invoices and discussed their contents with various individuals at National and that he was satisfied that the invoices should be included in the insurance claim. He also testified that this process took months to complete.

In relation to the categorization of the various losses, Von Brauchitsch testified that he took the actual insurance policy and broke down the coverage into categories. He then categorized each invoice or document as he received it, as either an operating or extra expense under the insurance policy. Specifically, Von Brauchitsch stated that he looked at the policy and made his own determination, as a public adjuster, as to which expenses were applicable to the operating expenses section and to the extra expenses section of the policy. He further testified that there were expenses that he believed did not fit under either of these sections and that he made the determination that such expenses were not covered under the policy, including Cohen's time spent in attempting to get National up and running. Finally, Von Brauchitsch opined, without objection, that the total operating expenses incurred as a result of the loss were $449,490.09, that the total extra expenses incurred as a result of the loss were $1,374,116.04 and that these losses were incurred within twelve months of the loss.

The jury had before it during Von Brauchitsch's testimony an enlargement of the spreadsheet listing each claimed operating or extra expense and its amount.[17]

---

[17] As to the use of the spreadsheet by Von Brauchitsch while testifying, counsel for Hartford did not object to Von Brauchitsch's using the spreadsheet: "This document—it is great if Mr. Von Brauchitsch wants to use it

Von Brauchitsch then testified about the invoices that were listed on the spreadsheet. We set forth several examples of Von Brauchitsch's testimony, which are illustrative, but not exhaustive, of his expense categorization and explanation why the expenses were incurred. For example, he explained that there were 285 items making up the operating expenses and that he had used his experience to determine what was an operating expense. He then explained that the first item on the operating expense list was for A-1 Ace Locksmith, that this was a repair to the security system and that this was a normal operating expense because businesses have repairs throughout the year and it is just a common occurrence. He went on to explain the second item on the list, which was for Advanced Computer Technology for $265. He explained that this was an operating expense because it was for computer technology services, which are normal and customary when a business has computers. As to one of the listed expenses for Belush, an accountant, Von Brauchitsch explained that he had to break down this bill, listing $6000 as an operating expense because businesses normally incur expenses for accountants throughout the year, and also listing additional charges as extra expenses because some of Belush's charges were related to restoring the business after the loss. He continued in this manner with respect to other items as well, sometimes grouping several invoices into a category such as "rent" or "telephone bills."

Von Brauchitsch testified in the same manner concerning the extra expenses incurred as a result of the loss. More specifically, Von Brauchitsch testified that

---

to go through as he is testifying that, yes, there were expenses for this, and the many consultants that were on the site told me were expended or paid for or whatever. But then he has got to be the one who testifies that it is actually covered under the policy." Counsel, however, did object to the jury's seeing the spreadsheet.

"[b]ased on my review . . . [National] had incurred quite a few large expenses as a result of this claim. And in discussing this with [Cohen] as well as the other parties that were involved, I was able to put together the assessment [of] repairs that were needed to try to get this business up and going. And based on that, we compiled a list of extra expense claims based on that judgment." Von Brauchitsch then went through the items listed as extra expenses. For example, in relation to an extra expense claim for Connect, Von Brauchitsch explained that the $88,242.35 bill was for the company to assess the actual computer system and to repair it. He concluded that this bill was an extra expense because it was a restoration cost due to the corruption of the computer system. He testified that a bill for Susan Allsop, in the amount of $70,000, was an extra expense because Allsop was responsible for filling out all the necessary paperwork to present to him and that she was helping to coordinate the move out of the offices. Testimony was offered concerning two bills from N.M.S. Solutions Group, Inc., for approximately $165,000 and $378,000, respectively. Von Brauchitsch testified that N.M.S. Solutions Group, Inc., was at National forty to sixty hours per week and that Simak, the owner, was there to assess and repair the actual computer system. Simak also gave National a conditional guarantee that once he got the system up and running, there would be no further complications. As to a bill from Kaster, for approximately $99,000, Von Brauchitsch testified that this was an extra expense because "had [National] not had this loss, the company would not have had to move and be forced to evacuate the premises due to nonpayment of rent." Similar testimony was offered on other extra expenses as well.

At the close of testimony, interrogatories were submitted to the jury, which specifically asked whether National had proven, by a fair preponderance of the

evidence, that its claims qualified for insurance proceeds from the policy under the following coverages: (1) business loss coverage; (2) extra expense coverage; and (3) employee dishonesty coverage, to which the jury answered "yes" under each individual category. The jury also was asked to assign an exact dollar amount of proven damages to each category, which it did. It was the province of the jury to accept or reject the testimony and definitions of Von Bräuchitsch. "Issues of credibility are uniquely within the province of the jury and therefore we will not endorse the testimony of one witness over another. Moreover . . . the factfinder is not required to draw only those inferences consistent with one view of the evidence, but may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 312, 838 A.2d 135 (2004).

Von Brauchitsch testified that these claimed losses either were operating expenses or extra expenses, explaining many of their purposes and the totals of each category. He also explained, as set forth in part I A, that he familiarized himself with National, met with key personnel, spent months assessing the insurance claim and was satisfied that the invoices should be included in the claim. He also personally classified these expenses. On the basis of the evidence presented at trial, we cannot agree with Hartford's claim that there was *no evidence* that any of the claimed expenses qualified either as normal operating expenses or extra expenses under the policy. See *Tadros* v. *Tripodi*, 87 Conn. App. 321, 329–30, 866 A.2d 610 (2005) (expert opinion regarded as evidence in its own right, and evidence sufficient where defense counsel does not object to expert accountant's testimony regarding conclusions as to amount of money stolen by defendants, which

testimony was based in part on report court admitted for limited purpose of showing bases of opinion).

## II

Hartford next claims that the court improperly admitted a summary spreadsheet into evidence without a proper foundation. Specifically, it claims that the court abused its discretion in submitting exhibit 174 to the jury because no foundation had been laid for the damages listed thereon.

Hartford argues: "The trial court's decision to admit the spreadsheets into evidence, despite the lack of any authentication, was harmful error. . . . It gave the jury evidence of something that had not been proven [and] [w]ithout the spreadsheets, the jury would have had no imaginable basis upon which to return the verdict that it did." (Citation omitted; internal quotation marks omitted.) National responds that the court properly admitted the spreadsheets as evidence because the listed expenses were based on Von Brauchitsch's personal observations, and they were reliable; additionally, the spreadsheets were necessary where the court, to avoid a protracted trial, ordered that National not attempt to authenticate each individual invoice relied on by Von Brauchitsch in forming his expert opinion.[18] We are frank to admit that we do not understand why the spreadsheet was not admitted for substantive purposes when § 10-5 of the Connecticut Code of Evidence and a line of cases, of which *Brookfield* v. *Candlewood*

---

[18] The summary spreadsheet concerning operating expenses listed 285 items. The extra expense portion of the spreadsheet listed forty-eight items. We also note that in an April 4, 1996 facsimile to Crane, bankruptcy counsel for National, Von Brauchitsch responded to a letter that had been sent by attorney Jeffrey Blueweiss on behalf of Hartford in which Blueweiss requested all of National's documents. Von Brauchitsch explained to Crane that Blueweiss' request was "totally absurd" in that "it [was] humanly impossible to supply him with all documents since they exceed[ed] [fifty] boxes of files, which weigh[ed] approximately [forty pounds] per box."

*Shores Estates, Inc.*, 201 Conn. 1, 513 A.2d 1218 (1986), is a part, state that summaries may be admitted provided that the documents on which they are based are available to the court and opposing counsel. Unavailability of some supporting documents, not due to the fault of the proponent, will not bar the admissibility of the summary. See 17 L. Russ & T. Segalla, supra, § 253.20. Nor is it clear to us why, when the jury was instructed against substantive use of the spreadsheet, it was given the spreadsheet as a full exhibit for its consideration during deliberations. However, we conclude that even if the summary spreadsheet were to be disregarded, there was adequate other evidence, testimonial and documentary, to warrant the jury's verdict. Further, we conclude that any harm from the limitations on the admission of the summary spreadsheet redounded more to the detriment of National.

"[T]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Additionally, before a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result. . . . Furthermore, [i]t is well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative of other validly admitted testimony." (Citation omitted; internal quotation marks omitted.) *Tadros* v. *Tripodi*, supra, 87 Conn. App. 328.

"Most modern evidence rules explicitly allow the introduction of summaries of records which are lengthy, complicated, or both, in the original form. Even before the explicit recognition of this, however, many

courts were deemed to have the discretion to permit a witness to testify as to lengthy, complicated, and voluminous records as an exception to the best evidence rule. [The] [b]est evidence rule does not prohibit a witness testifying from a memorandum or transcript prepared by him . . . as a matter of convenience. Illustrative of the foregoing, it has been held that where evidence of the contents of voluminous books and accounts is relevant and competent, the trial court may in its discretion permit an expert accountant or other competent witness to testify to the result of his . . . examination of the books of account or present schedules showing the details thereof, together with a summary of his . . . computation, provided that (1) the books either have been introduced in evidence or are available to the court and to opposing counsel, or (2) the books and accounts which he . . . has examined are not, at the time of trial, available because they are beyond the jurisdiction of the court or have been lost or destroyed without the proponent's fault." 17 L. Russ & T. Segalla, supra, § 253.20; see Conn. Code Evid. § 10-5.

As stated long ago by our Supreme Court: "When the opinion of the witness in a case is evidence otherwise competent, and the subject of the investigation will be made clearer by its introduction, the opinion should be received. When facts sought to be proved are of so voluminous or complicated a character that their introduction would occupy much time, and might be difficult to understand by themselves, and these many facts are to be proved for the purpose of drawing a conclusion from them, the court may permit a witness who is qualified upon the subject of investigation, and has made the investigation, to express an opinion without giving the details on which the opinion rests. The opinion of the expert as to whether a building is finished in a workmanlike manner, or according to certain plans and

specifications [for example], is admissible for the same reason as is the opinion of the accountant as to the result of his examination of the books of account, or as to schedules taken from the books, verified by him . . . or as summaries or averages from voluminous or complicated records are admitted." (Citation omitted.) *Schaefer, Jr., & Co.* v. *Ely,* 84 Conn. 501, 509, 80 A. 775 (1911), citing *Elmira Roofing Co.* v. *Gould,* 71 Conn. 629, 631, 42 A. 1002 (1899), and 2 J. Wigmore, Evidence (3d Ed. 1904) § 1230; see also *Brookfield* v. *Candlewood Shores Estates, Inc.,* supra, 201 Conn. 12.

In this case, while counsel was arguing before the court on whether exhibit 174 would be shown to the jury, the court specifically stated that it was not going to force National to put every single invoice into evidence because the jury would not know what to do with the voluminous documents.[19] Although the court stated that it would not admit exhibit 174 as substantive evidence to prove National's claimed damages, it did allow the spreadsheet to come into evidence as a full exhibit to assist the jury. Additionally, as quoted in part I A, the court articulated the following in relation to exhibit 174: "[National] presented Von Brauchitsch, a licensed insurance adjuster, who explained the definition of operating expenses and extra expenses and testified that he had determined that all the items listed on exhibit 174 were valid operating expenses and extra expenses. Exhibit 174 was not substantive evidence that the listed items were such expenses, but Von Brauchitsch's testimony was, and it was based on his examination of the claimed items."

Von Brauchitsch testified as to the difference between operating expenses and extra expenses and stated that those two types of expenses frequently cross over and overlap. He testified that he met with various

---

[19] See footnote 18.

individuals and computer experts to assess the damages at National, to go over invoices and to categorize the expenses. He testified that he was given financial statements, that he had numerous meetings with the consultants and accountants regarding every aspect of the loss, that he went through the invoices and discussed their contents with various individuals at National to make sure that he was satisfied that the invoices should be included in the claim and that this process took months.

He then developed a summary spreadsheet listing the categorized damages, and he explained that this is a typical way in which adjusters keep the voluminous records of damages. He also testified that each of National's claimed expenses was either a normal operating expense or an extra expense as specifically listed and designated on the spreadsheet and that he had prepared the spreadsheet after familiarizing himself with National, speaking with key individuals and gathering bills, invoices and other important information. He further testified as to the exact total of each of these categories and explained most of the listed items and their purpose. Von Brauchitsch also testified that, in his expert opinion, the total value for National's operating expenses, including open leases, was $449,490.09 and that he relied on invoices and information provided by Hartford in arriving at that opinion. He went on to testify that in his opinion, the extra expenses incurred by National as a result of the loss were $1,374,116.04. Von Brauchitsch then was asked about many of the expenses listed on the spreadsheet during direct, cross and redirect examination and asked to explain them. During cross-examination, Von Brauchitsch testified that his files were taken from him throughout the course of National's claim and that some of the invoices that were relied on in developing the spreadsheet and finaliz-

ing his figures were missing, but that he did have the majority of the invoices in his file with him at trial.

As previously set forth, "where evidence of the contents of voluminous books and accounts is relevant and competent, the trial court may in its discretion permit an expert accountant or other competent witness to testify to the result of his . . . examination of the books of account or present schedules showing the details thereof, together with a summary of his . . . computation, provided that (1) the books either have been introduced in evidence or are available to the court and to opposing counsel, or (2) the books and accounts which he . . . has examined are not, at the time of trial, available because they are beyond the jurisdiction of the court or have been lost or destroyed without the proponent's fault." 17 L. Russ & T. Segalla, supra, § 253.20; see Conn. Code Evid. § 10-5.

Here, as Von Brauchitsch testified, many of the invoices were with him at trial, and the evidence demonstrated that thousands of documents had been turned over to Hartford in preparation for trial and while it was assessing National's insurance claim. Additionally, although Von Brauchitsch testified that some of the invoices were missing, he explained that they were unavailable because they had been lost during the transfer of his files throughout the assessment of National's claim. Accordingly, we conclude that it was within the court's discretion to permit Von Brauchitsch to testify as to the result of his work and to present the spreadsheet showing the details thereof as a summary of his computation. See 17 L. Russ & T. Segalla, supra, § 253.20; Conn. Code Evid. § 10-5. The evidence demonstrated that the invoices and bills that formed the basis of this summary were available to the court and to opposing counsel, except for some that were unavailable because they had been lost or destroyed through

no fault of Von Brauchitsch. See 17 L. Russ & T. Segalla, supra, § 253.20; Conn. Code Evid. § 10-5.

On the basis of the foregoing, we cannot conclude that the court improperly admitted into evidence the spreadsheet, exhibit 174, summarizing Von Brauchitsch's calculations. Additionally, even if we were to assume that the court's ruling was improper, the totals contained on the spreadsheet merely were cumulative of Von Brauchitsch's testimony, which specifically, without objection, set forth the amount of operating expenses and extra expenses claimed under the policy; see *Tadros* v. *Tripodi*, supra, 87 Conn. App. 329–30; and there is nothing in the record to suggest that the jury considered the summary spreadsheet for any purpose other than the limited one for which it was admitted. See id., 330. This is the only conclusion warranted, given the jury's award of approximately $500,000 less than that claimed on the summary spreadsheet. The jury was able to distinguish items of damages it found to have been proven from those that had not been proven, and it did not blindly award damages for each item listed on the spreadsheet.

III

Hartford next claims that the court improperly refused to charge the jury on its special defense that proper notice was not given pursuant to the contract.[20]

[20] Hartford's set forth eighteen separate special defenses in its answer. The sixth special defense, which is relevant to this claim on appeal, provided: "The Hartford Spectrum Business Insurance Policy provides, in pertinent part:

"E. PROPERTY LOSS CONDITIONS

"3. Duties in The Event Of Loss Or Damage

"You must see that the following are done in the event of loss of or damage to Covered Property:

"b. Give us prompt notice of the loss or damage. Include a description of the property involved.

"c. As soon as possible, give us [a] description of how, when and where the loss or damage occurred.

"e. At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

Specifically, Hartford argues that it "presented evidence that was more than sufficient to support that contention, as it established that [National] did not give notice of the claim until approximately two months after discovering the alleged loss." Hartford further argues that it submitted a request to charge on its special defense of insufficient notice and that, when the court failed to charge as requested, it took an exception, thus preserving the issue for appeal. National argues that the court was not required to charge on this defense because there was no evidence that the notice was untimely. Additionally, National argues that Hartford has failed to show material prejudice as a result of the court's refusal to charge on this defense. We conclude that even if we were to assume, without deciding, that the court improperly failed to charge the jury on Hartford's sixth special defense, which included the duty to provide prompt notice, it was harmless error.

"In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with

"f. Permit us to inspect the property and records proving the loss or damage.

"h. Send us a signed, sworn statement of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

"i. Cooperate with us in the investigation or settlement of the claim.

"j. Resume part or all of your 'operations' as quickly as possible.

"The plaintiff has breached some or all of the policy's Property Loss Conditions set forth above, and therefore, there is no coverage under the policy."

a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence." (Citations omitted; internal quotation marks omitted.) *Matthiessen* v. *Vanech*, 266 Conn. 822, 828–29, 836 A.2d 394 (2003) (court's refusal to charge on special defense not improper where defense not reasonably supported by evidence).

"[I]t is axiomatic . . . that not every error is harmful. . . . [W]e have often stated that before a party is entitled to a new trial . . . [it] has the burden of demonstrating that the error was harmful. . . . An instructional impropriety is harmful if it is likely that it affected the verdict. . . . In [*Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 243, 828 A.2d 64 (2003)], our Supreme Court adopted the factors set out in the California Supreme Court's opinion in *Rutherford* v. *Owens-Illinois, Inc.*, 16 Cal. 4th 953, 983, 941 P.2d 1203, 67 Cal. Rptr. 2d 16 (1997), to determine whether an improper instruction was likely to have affected the result. *Rutherford* stated that [t]he reviewing court should consider not only the nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury, but the likelihood of actual prejudice as reflected in the individual trial record, taking into account (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (Citations omitted; internal quotation marks omitted.) *DeMatteo* v. *New Haven*, 90 Conn. App. 305, 310–11, 876 A.2d 1246, cert. denied, 275 Conn. 931, 883 A.2d 1242 (2005). In this case, we conclude that even if the court's refusal to charge on Hartford's special defense of untimely notice was improper, National met its burden of proving that any delay in giving notice did not prejudice Hartford, and Hartford has failed to demonstrate any harm as a result of the court's refusal to charge on this defense.

"In this state, an insurance policyholder who fails to give an insurer timely notice of an insurable loss does not forfeit his insurance coverage if he can prove that his delay did not prejudice his insurer." *Taricani* v. *Nationwide Mutual Ins. Co.*, 77 Conn. App. 139, 140, 822 A.2d 341 (2003), citing *Aetna Casualty & Surety Co.* v. *Murphy*, 206 Conn. 409, 417–18, 538 A.2d 219 (1988). "In *Murphy*, our Supreme Court held that an insured might be relieved from his contractual obligation to give his insurer timely notice of the occurrence of a loss if the insured could show that his delay in giving notice did not prejudice the insurer. . . . The court first observed that the modern law of contracts seeks to accommodate the principle of strict compliance with contract conditions and the principle of avoiding a disproportionate forfeiture for a default that is not wilful. . . . *Murphy* held that a showing of the absence of prejudice would excuse a failure to give timely notice of the occurrence of an insurable loss for three reasons. First, because insurance policies are 'contracts of adhesion,' purchasers of such policies have no opportunity to bargain about the consequences of delayed notice. . . . Second, because cancellation of an insurance policy for failure to give timely notice takes no account of past payments of premiums, possibly extending many years back, enforcement of these notice provisions may operate as a forfeiture. . . . Third, although an insurer has a legitimate interest in guaranteeing itself a fair opportunity to investigate accidents, that interest can be protected without an irrebuttable presumption that late notice is always prejudicial to the insurer." (Citations omitted.) *Taricani* v. *Nationwide Mutual Ins. Co.*, supra, 148–49.

The record reveals that National satisfied its burden of proving that Hartford was not prejudiced by the timing of the notice. Before embarking on our analysis, however, we first address Hartford's assertion that J.

M. Layton was not its agent and conclude that the record demonstrates otherwise.

Woodward, from J. M. Layton, testified that his agency is a "sales organization [that] would go out and try to write as [many insurance] instruments as [it] could. And [it] would submit applications on behalf of clients to various insurance companies and [hope that] the insurance companies would write the insurance, and [it] would be the servicing agent for the client and for the insurance company." He also testified that he was licensed by the state of Connecticut to sell insurance and that he, in part, was sponsored for this license by Hartford.[21] His company had handled thousands of claims over a ten year period, and Hartford was the largest carrier in his office for which he wrote insurance. In terms of volume, his company was in the top 10 percent of agencies writing insurance on behalf of Hartford, attaining more than $5 million in premiums per year.

More significantly, Thomas Effley, an adjuster with Hartford for twenty-eight years,[22] testified that he exclusively handled large property losses for Hartford and that National's claim was given to him in August, 1995, by his supervisor, Gasper Kuhn. He further testified

[21] General Statutes § 38a-702b provides: "A person shall not sell, solicit or negotiate insurance in this state for any class or classes of insurance unless the person is licensed for that line of authority in accordance with sections 38a-702a to 38a-702r, inclusive."

General Statutes § 38a-702a provides in relevant part: "(1) 'Agent' or 'insurance agent' means an insurance producer appointed by an insurer to act on the insurer's behalf pursuant to section 38a-702m. . . . (6) 'Insurance producer' or 'producer' means a person required to be licensed under the laws of this state to sell, solicit or negotiate insurance. . . ."

General Statutes § 38a-702m (a) provides: "An insurance producer shall not act as an agent of an insurer unless the insurance producer becomes an appointed agent of the insurer. An insurance producer who is not acting as an agent of an insurer is not required to become appointed."

[22] Effley died before the start of trial, and his deposition was read into the record.

that J. M. Layton was Hartford's agent and that Kuhn had received the first report of National's loss from this agent.

Kuhn testified that he had worked for Hartford for sixteen years and that in 1995 he had been a claims supervisor, but that Effley had not been under his supervision. He stated that J. M. Layton was an insurance agency that Hartford used to write its insurance in the 1990s.

Reviewing the record, we can find no evidence that contradicts this testimony and conclude that Effley's statement was an uncontested admission that J. M. Layton was its agent. Although Hartford argues that J. M. Layton was not its agent, the only evidence offered at trial supports a contrary conclusion. Accordingly, we find no merit in Hartford's argument and continue our analysis of Hartford's claim.

Woodward specifically testified that when he received notice from Cohen at the end of January, 1995, he did not believe that Hartford was in any way prejudiced by the timing of this notice. He also testified that he did not report this claim to Hartford immediately because it "was a property claim as opposed to a liability claim, which would need immediate action," and that his own decision to wait before reporting the claim to Hartford did not prejudice Hartford. Woodward also testified that Cohen was cooperative and that he had provided whatever documentation or information Woodward needed in order to put Hartford on notice.

Kuhn testified that there was nothing in his file that reflected that Hartford was prejudiced in any way by National's not submitting a bond claim form to Hartford until August, 1995.

"The general rule . . . is that the principal is chargeable with, and bound by, the knowledge of or notice

to his agent received while the agent is acting as such within the scope of his authority and in reference to a matter over which his authority extends. The fact that the knowledge or notice of the agent was not actually communicated will not prevent the operation of the general rule, since the knowledge or notice of the agent is imputed to the principal and is therefore constructive notice . . . ." 3 Am. Jur. 2d, Agency § 281 (1986); see *West Haven* v. *United States Fidelity & Guaranty Co.*, 174 Conn. 392, 395, 389 A.2d 741 (1978).

Here, it was undisputed that National notified J. M. Layton that it had losses in January, 1995. Further, the evidence was undisputed that J. M. Layton was Hartford's agent. Woodward, the chief executive officer of J. M. Layton, testified that he believed that Hartford was not prejudiced by the timing of this notice or by his own delay in sending notice to Hartford. In addition, the evidence reveals that even after receiving notice from its agent, Hartford did not begin its investigation of National's claim for several months.

Kuhn testified that Hartford received the first notice of National's loss in March, 1995, from J. M. Layton, but he did not have enough information from these documents to determine what coverage might be triggered under the policy. He did, however, send National's attorney a proof of loss form for a fidelity bond because he thought the employee dishonesty section of the policy was applicable. When further questioned during trial, Kuhn admitted that the other sections of the policy might also have been triggered, but Hartford never sent further proof of loss forms for the other policy sections. Kuhn also testified that it was part of his job to determine what coverage might be triggered under the policy based upon the notification given to Hartford. Further, he did not consult with anyone with more experience than he had in dealing with computer type claims and that, to his knowledge, there was no one at Hartford

who had experience in handling claims related to allegations of computer sabotage and theft. Kuhn also testified that after receiving an August 2, 1995 letter from Von Brauchitsch in which Von Brauchitsch discussed employee dishonesty, vandalism and theft, he did not "look at National's insurance policy and attempt to make a determination about whether or not there were any other coverages that were triggered as a result of the losses claimed by [National]." Nor, at any time between March and August, did he look at the policy to determine whether any other section might have been triggered by National's claim that it was unable to operate its business. Nor did he attempt to contact anyone at National to discuss or evaluate its claim. Kuhn finally testified that he would have had no way of knowing whether Hartford had been prejudiced by the timing of National's return of the fidelity bond form and that there was nothing in his file to indicate prejudice. No other testimony was offered by Kuhn concerning any possible prejudice to Hartford related to the timing of National's notice.

Effley testified that the file on National's claim was given to him by his supervisor, Kuhn, in August, 1995, and, after getting the file, he asked Gregory Ashayeri, Hartford's computer expert, to go to National, assess the situation and "find out exactly what . . . the damage was, what exposure [Hartford had]." He further testified that Ashayeri reported back to him that National's claim was in the millions, but that Ashayeri could not determine a breakdown of the loss without more research. After receiving this report from Ashayeri, Effley had Cohen sign a nonwaiver form, which would allow Ashayeri to obtain more information. Further Effley testified that both Cohen and Von Brauchitsch "were very cooperative." Effley did not receive a final report from Ashayeri because attorneys got involved and, for all practical purposes, he was taken off the file.

Effley offered no testimony to establish that Hartford in any way was prejudiced by the timeliness of National's notice.

Ashayeri, the owner of Management Concepts, a computer systems consultant, testified that he was not retained by Hartford to assess the computer damage at National until September, 1995. Ashayeri also testified: "Effley . . . called me, as he had in the past, and told me that there was a computer loss type claim that they had where they needed an expert to go in and tell the Hartford—they said it was very complicated and they needed an expert to go in and tell the Hartford basically what had happened, what were the damages and what they needed to do to get back into operation." Ashayeri offered no testimony as to whether the timing of National's notice in any way prejudiced Hartford.

Even if we assume, without deciding, that the court's refusal to charge on the issue of notice was improper, we conclude that the error was harmless because National has met its burden of proving that Hartford was not prejudiced by any alleged late notice, and Hartford has failed to demonstrate any harm by the court's refusal to charge on the issue. The only testimony offered on the issue of prejudice demonstrated a lack of prejudice to Hartford, thereby satisfying National's burden of proof, which Hartford never rebutted. Additionally, before this court can order a new trial for an allegedly improper failure to give a jury instruction, Hartford had the burden of demonstrating that the failure to charge was harmful in that it likely affected the verdict. See *DeMatteo* v. *New Haven*, supra, 90 Conn. App. 310–11. On the bases of National's having met its burden regarding a showing that any late notice did not prejudice Hartford, and Hartford's failure to show how it was harmed by the court's refusal to charge on the issue of notice, we conclude that this claim necessarily fails.

## IV

Hartford's fourth claim is that the court improperly denied its motion for a mistrial after National's counsel made multiple inflammatory remarks during closing argument. This ground also was raised in Hartford's motion to set aside the verdict. Specifically, Hartford argues: "During closing argument, [National's] counsel argued that [Hartford] acted in bad faith in denying [National's] claim. There was, however, no bad faith claim before the jury. Thus, the fact that [National's] counsel focused much of his closing argument on that issue was highly prejudicial and inflammatory. It was particularly inappropriate given that during the trial, the court had specifically instructed the plaintiff's counsel that references to bad faith were impermissible."[23] Hartford goes on to argue that "[t]he improper closing argument precluded [Hartford]'s ability to receive a fair trial, and so the trial court abused its discretion when it denied [Hartford]'s motion for a mistrial." National argues that the challenged remarks were made in response to and to disprove Hartford's special defenses of lack of cooperation and fraud and that they were an appropriate way to summarize the evidence that

---

[23] The actual facts surrounding the court's instruction regarding comments on any allegation concerning bad faith on the part of Hartford are as follows. During direct examination, Von Brauchitsch referenced a bad faith claim against Hartford when asked by counsel why he had submitted a certain bill to Hartford if he had thought that it was not going to be paid. After Hartford's counsel objected, the court instructed: "That is not allowable testimony here. And I am a little upset about that. I will tell the jury that there is no bad faith claim against [Hartford] in this case.

"In other words . . . there is a legal claim that . . . is sometimes made against insurance companies that is recognized by the law, a claim that an insurance company has not dealt with an insured's claim for recovery in a fair manner, that they have dealt with it in bad faith. There is a possible legal claim one can make. That claim is not being made against [Hartford] in this case and, therefore, I will ask you to please disregard any testimony along that line because it is not part of this case, and it should not have been brought up."

National, in fact, did cooperate with Hartford and did not act fraudulently. Additionally, National argues that even if these remarks were improper, they "were not manifestly prejudicial, given that the evidence amply supported the verdict . . . ." We agree that the remarks were not improper.

At the outset, we identify the appropriate standard of review. "While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Internal quotation marks omitted.) *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 316–17, 852 A.2d 703 (2004).

"Where a claim is made that remarks by opposing counsel jeopardized a party's right to a fair trial, [a] verdict should be set aside if there has been manifest injury to a litigant, and it is singularly the trial court's function to assess when such injury has been done since it is only that court which can appraise the atmosphere prevailing in the courtroom. . . . The trial judge has discretion as to the latitude of the statements of counsel made during argument. . . . If a counsel's remarks so prejudice the ability of a party to obtain a fair trial,

a new trial is mandated." (Citation omitted; internal quotation marks omitted.) *Murray* v. *Taylor*, 65 Conn. App. 300, 306, 782 A.2d 702, cert. denied, 258 Conn. 928, 783 A.2d 1029 (2001).

In its brief, Hartford directs us to five different instances where National allegedly made improper comment on Hartford's bad faith. Hartford objected on three of these occasions. In reviewing National's closing argument, we can find no reference to the words "bad faith." National argued, albeit forcefully, that it did cooperate with Hartford throughout the process. It also explained, on the basis of the evidence, the claim process and the interactions between Hartford and National in relation to the claim. It argued that it was Hartford that breached the contract by failing to pay the proceeds under it and that National did not commit fraud or misrepresentation. Although National argued both forcefully and zealously, we agree with the trial court that National's remarks were not improper where National had the burden to prove that Hartford had breached its insurance policy by failing to pay proceeds to which National was entitled, and it had to defend against Hartford's special defenses of breach of some or all of the policy's conditions, fraud and misrepresentation. After a thorough review of the closing arguments, we conclude that National's remarks were not improper and did not prejudice the ability of Hartford to obtain a fair trial.

V

Hartford's final argument on appeal is that the court improperly excluded evidence regarding a prior felony conviction of Cohen, National's principal. Specifically, Hartford argues: "Cohen, [National's chief executive officer] and president, was convicted in 1974 of filing a fraudulent tax refund claim. . . . His sentence ended twenty-four years prior to the trial of this case. The

trial court committed harmful error when, despite the fact that Cohen's credibility was a critical issue, it barred [Hartford] from introducing evidence of that conviction." National argues that the court properly granted its motion in limine to exclude the evidence of Cohen's conviction on the grounds that it was too remote in time, would unduly prejudice the jury and would distract from the real issues of the case. We agree with National.

"[T]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Additionally, before a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result." (Internal quotation marks omitted.) *Tadros* v. *Tripodi*, supra, 87 Conn. App. 328. "Generally, evidence that a witness has been convicted of a crime is admissible to impeach his credibility if the crime was punishable by imprisonment for more than one year. . . . In determining whether to admit evidence of a conviction, the court shall consider: (1) the extent of the prejudice likely to arise; (2) the significance of the particular crime in indicating untruthfulness; and (3) the remoteness in time of the conviction. . . . Moreover, [i]n evaluating the separate ingredients to be weighed in the balancing process, there is no way to quantify them in mathematical terms. . . . Therefore, [t]he trial court has wide discretion in this balancing determination and every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted;

internal quotation marks omitted.) *Label Systems Corp. v. Aghamohammadi*, supra, 270 Conn. 307; see also Conn. Code Evid. § 6-7 (a). Specifically in relation to the remoteness in time prong of the balancing test, we have noted that "although no absolute time limit has been adopted, a ten-year limit has been suggested. . . . The ultimate discretion whether to allow into evidence a conviction greater than ten years old rests with the court." (Citation omitted.) *State* v. *Vitale*, 76 Conn. App. 1, 8, 818 A.2d 134, cert. denied, 264 Conn. 906, 826 A.2d 178 (2003); see also *Label Systems Corp.* v. *Aghamohammadi*, supra, 305–16.

Cohen's conviction of filing a false tax return fell outside the general ten year guideline. Although we recognize that such a conviction has significance on the issue of veracity, Hartford has not demonstrated that the court's action was an abuse of discretion. "The trial court, because of its intimate familiarity with the case, is in the best position to weigh the relative merits and dangers of any proffered evidence." (Internal quotation marks omitted.) *State* v. *Prutting*, 40 Conn. App. 151, 160, 669 A.2d 1228, cert. denied, 236 Conn. 922, 674 A.2d 1328 (1996).

The judgment is affirmed.

In this opinion the other judges concurred.